Submitted January 19, vacated and remanded for reconsideration of father's motion to dismiss March 30, 2016

In the Matter of G. P. F.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. V.-G.,
*Appellant.*

Washington County Circuit Court
J130088;
Petition Number 01J130088;
A160221

370 P3d 916

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Valerie Colas, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Egan, Judge, and Shorr, Judge.

EGAN, J.

**EGAN, J.**

In this juvenile dependency case, father appeals a permanency judgment that denied father's motion to change the plan for child from adoption to return to parent, and continued the current permanency plan of adoption. Before the hearing to change the plan, father moved to dismiss jurisdiction and terminate the wardship. At the hearing, the juvenile court denied father's motion to dismiss. Father contends that, in regard to his motion to dismiss, the juvenile court erred in admitting an exhibit that was inadmissible hearsay, and we agree.[1] The Department of Human Services (DHS) responds that that error was harmless. We conclude that that error was not harmless because the record does not allow us to conclude that the juvenile court would have reached the same conclusion—that is, the juvenile court did not indicate whether the evidence—independent of the inadmissible hearsay—was sufficient to warrant continued jurisdiction over G. Accordingly, we vacate and remand for reconsideration of father's motion to dismiss.

For background purposes, we describe the facts consistently with the juvenile court's decision to take jurisdiction.[2]

The child, G, was born prematurely in May 2013 and tested positive for heroin and methamphetamine, which caused G to have "significant withdrawal" symptoms that were treated in the neonatal intensive care unit for nine days. DHS took G into protective custody the day after he was born and petitioned the juvenile court to take jurisdiction over G.

The jurisdictional petition alleged that G's "condition or circumstances are such as to endanger the welfare of [G] by reason of the following facts" related to father:

---

[1] Father also argues in his second assignment of error that, even if the juvenile court properly relied on the contested exhibit, DHS nonetheless failed to prove that the factual bases for jurisdiction continued to expose the child to a threat of serious loss or injury likely to be realized. We do not reach that assignment of error because our resolution of father's first assignment of error obviates the need to do so.

[2] Our standard of review in this case, which involves questions of evidentiary error and harmlessness, is described in our analysis of those issues.

"I.    The father has engaged in a pattern of domestic violence with others with whom he has had a relationship, he has not successfully engaged in treatment for this conduct and he is currently in a relationship with the child's mother.

"J.    The father is involved in criminal activities that interfere with his ability to safely parent the child.

"K.    The father's residential instability; employment instability; financial instability and chaotic lifestyle interfere with his ability to safely parent the child.

"L.    The father's substance abuse interferes with his ability to safely parent the child.

"M.    [Father] is said child['s] biological father."

On June 17, 2013, father did not appear for the hearing on the jurisdictional petition. Consequently, the juvenile court entered judgment on the above allegations (I, J, K, L, and M) and established jurisdiction over G.[3]

In order to reunite with G, DHS requested that father engage in the following services, among other things: a domestic violence assessment, a mental health evaluation, substance abuse assessment and treatment, a paternity test, and visits with G. Father failed to engage in any of those services. Father cancelled visits with G on several occasions. His last recorded visit with G was on October 29, 2013.

On August 19, 2013, father entered a guilty plea to possession of a controlled substance and was placed on probation and ordered to complete a substance abuse treatment program. In December 2013, father was arrested and placed in custody on an immigration hold. On December 30, 2013, father entered a guilty plea to second-degree theft and was placed on probation. In March or April 2014, father was deported to Mexico. Following father's deportation, DHS was not able to locate father, and father's attorney was permitted to withdraw from representing him because she had not had contact with him in over a year. On September 8, 2014, the court changed the permanency plan for G from return to parent to adoption.

---

[3] The juvenile court also established jurisdiction over G related to mother at that time. Mother's parental rights were terminated on December 1, 2014.

On December 8, 2014, DHS caseworker Desiree Coomes spoke with father, who was in Mexico, by phone, and father told her that he wanted to engage in services and be reunified with G. Father told Coomes that he no longer drank alcohol or used drugs. Following that conversation, on December 12, 2014, Coomes sent father a letter of expectation that included, among other things, an expectation to: maintain written contact with G, maintain monthly phone contact with DHS, and "participate in a comprehensive substance abuse assessment and follow through with any treatment recommendations." The letter also specified that the "agreement [would] remain in effect from December 12, 2014 through March 12, 2015, at which time progress will be re-evaluated and a new agreement may be negotiated." Around that time, father also completed a paternity test that proved that he is the biological legal father of G.

In February 2015, a warrant was issued for father for failing to pay court fines. In April 2015, DHS caseworker Coomes sent pictures of G to father, and as the letter of expectation requested, father wrote a letter to G.

In June 2015, at the request of DHS, the Puebla State System for Integral Family Development (DIF), a child welfare agency in Mexico, conducted a study of father.[4] The DIF report contained a socioeconomic study, photos of father's family and home, a psychological evaluation, and criminal background clearance. The socioeconomic study and psychological evaluation included the following observations, among others:

- "The living conditions appear to be good and stable," and also have "all of the utility services, lighting, sewage, portable water, security, medical services, schools, businesses, etc."

- Father "does not show his emotions easily, but he states that he will comply with all that is required of him."

- "In terms of the child[]'s care, [father] would get support from his mother * * * when * * * [father] works."

---

[4] DHS did not receive any substantive information from DIF regarding father's services or progress outside of the DIF report.

- Father's parents "work in [a] commercial business, they have a butcher shop which allows them to have a financially stable life."

- Father is generally capable of resolving problems and managing stress, "but not appropriately, given his history."

- Father "may not be [a protective person able to meet G's general needs], but with the support of his family he would be able to do it."

- Father's family is not supportive of one another— "the family relationships are distant, cold and limited to respect and scant time spent together as a family."

- In the behavioral analysis, the DIF caseworker observed that, "[i]n his daily life [father] adopts a calm and reserved behavior with his neighbors and family; he does, however, tend to be explosive and impulsive. He also prefers to be isolated or [distant] from others in order to avoid being questioned about his past life."

- In the interactive analysis, the DIF caseworker observed that father "continues to have difficulty relating."

- In the emotional analysis, the DIF caseworker observed that father "does not show his feelings and emotions with his extended family, because his relationship with his parents has been discourteous, cold, authoritarian and violent. There is no opening to give or receive affection."

- Father did not "show signs of an altered mental state."

In July 2015, the juvenile court held a three-day contested permanency hearing on father's motion to change the plan from adoption to reunification. Before the hearing, father requested that the juvenile court bifurcate the hearing to separately consider his motion to dismiss jurisdiction and his motion to change the permanency plan back

to reunification. Father argued that the separate motions required different evidentiary standards,

> "so since we have both of those pending motions on my part, the motion to dismiss and the motion for the permanency hearing, I don't want to see those two hearings get too muddled up together, if that makes sense, because of the evidentiary standards. So I'd object to the court receiving the permanency packet today and request that we set a full day to deal with both motions to dismiss and the contested permanency hearing."

The juvenile court proceeded with the permanency hearing, allowed the parties to submit written responses in regard to father's motion to dismiss, and addressed father's motion to dismiss later.

> "[THE COURT]:   I would actually—you know, (inaudible). I mean given the—the recent case law, I'm very reluctant to dovetail both a motion to dismiss and a permanency hearing. I think what—I think the issues are different and I—I want to make sure the record is clean and so I'm—I'm very reluctant to do the two together.
>
> "* * * * *
>
> "* * * It may not be the most judicially efficient, but at the same time I want to make sure we—we do everything so that the record is clear, so—and then in regards to the motion to dismiss, I would prefer a written response and so I—I want to give you time to adequately respond and then set oral argument as to that motion to dismiss. But in regards to the permanency hearing, what I will do is I will take this under advisement."

At the permanency hearing, Coomes testified that, while in Mexico, father provided a single urinalysis that was negative and completed a psychological evaluation, but did not engage in drug and alcohol treatment. Coomes explained that a single negative urinalysis that could have been a scheduled appointment "doesn't really give me a clear picture whether or not he's using." She believed that father needed to engage in substance abuse treatment because, from her "experience working with people with substance abuse issues[,] * * * generally people need to engage in treatment." At the conclusion of Coomes's direct testimony, DHS

offered State's Exhibit 1, which included the DIF report, and father did not object.

Father testified that he had not used controlled substances or drunk alcohol in excess since December 2013. Father admitted that he did not engage in any of the services recommended by DHS, including drug and alcohol treatment. However, father claimed that he discussed his drug and alcohol concerns with a psychologist who was not affiliated with DIF. Father's parents also testified that father did not use controlled substances.

Father testified that he had not had contact with G's mother since he was in prison and that he was not currently in a relationship with anyone. He was living with his parents and two siblings, who were all free of drug or alcohol addiction. Father was employed—working at his uncle's iron workshop and his father's butcher shop. Father stated that he had a good relationship with his parents and that his parents would help him raise G if G were to be reunited with father in Mexico. Father's parents also testified that father did not behave violently or aggressively towards them or the rest of the family.

The juvenile court denied father's motion to change the plan from adoption to return to parent. The juvenile court found, among other things, that "father does not have a relationship with [G]"; father had an active arrest warrant for criminal activity; "father lives in Mexico and his ability to comply with conditions of probation here in the U.S. is compromised"; "[f]ather has not completed any type of substance abuse or domestic violence treatment program"; "father has not been willing to[,] or has not followed through with services in over two years"; "there is a pattern * * * of [f]ather not following through with DHS or probationary conditions[,] and as such the Court does not find sufficient evidence to change the plan to return to parent." The juvenile court specifically stated that the DIF report

"is not favorable to * * * father with respect to his ability to parent the child. There is evidence that father is not able to 'appropriately' resolve problems[,] and manage stress. And, on [the] one hand, the report indicates that the father is

most likely not able to meet the child's needs 'alone', but with family support he may be able to safely parent.

"On the other hand, the report describes a family that is not supportive of [him] * * *. Thus, it is not clear to the court how this family would be able to meet the child's needs based on the evidence contained within the DIF report."

Based on those findings, the juvenile court explained that "[t]he specific allegations that brought the child into care have not been adequately addressed."

After the juvenile court denied father's motion to change the plan, the court separately addressed father's motion to dismiss. Father objected to the admissibility of the DIF report on the grounds, among others, that it contained inadmissible hearsay that the court could not rely upon to determine whether ongoing jurisdiction was warranted.

"[FATHER'S COUNSEL]: Judge, I would note that I do have an objection to material contained both within the state's response and [the child's counsel's] response in that both of those motions do reference material from the DIF report. (Inaudible) motion to dismiss the rules of evidence do apply. I would object to the court's consideration of material from the DIF report based upon rules of hearsay, rules of foundation, admissibility, as well as on due process grounds, Your Honor.

"The DIF report is being relied upon by the state to supply substantive evidence against my client and I do not have the opportunity at this time to cross-examin[e] the—the authors of that report, cross-examine the evaluator. On those bases, judge, I do object to the court's consideration of any of the material contained within the DIF report.

"[THE COURT]: I guess, with all due respect, [father's counsel], you spent a good deal of time during the permanency hearing going over the DIF report with your client and the other parties on the stand. Did you not?

"[FATHER'S COUNSEL]: I did, judge, and that's why I requested that the permanency hearing and the hearing to dismiss be separate entities, because I do believe that the evidentiary standards regarding a contested permanency hearing are separate and distinct [from] the evidentiary standards of the motion to dismiss. And it was my understanding that the court had—that that was the

court's intent[ion] as well was to separate the motion to dismiss from the motion to—or motion to change the permanency plan, the permanency hearing."

Father then argued that, even if the juvenile court did consider the DIF report, there was still insufficient evidence to prove that G was exposed to a threat of serious loss or injury that was likely to be realized:

"Even if we bring in the DIF report and its analysis in this case over my objections, Your Honor, again that DIF report doesn't supply firm substantial evidence to this court that a current safety risk exists rising to the level of— rising to the level of continued jurisdiction. What it describes is some conditions of concern; but not conditions that rise to the level of a serious threat of loss or injury."

Ultimately, the juvenile court overruled father's evidentiary objection and admitted the DIF report as evidence with regard to father's motion to dismiss. The juvenile court adopted its findings that it made in connection with the permanency plan and denied father's motion to dismiss. The juvenile court explained:

"I'm going to * * * deny the motion to dismiss and find the briefs filed by [the] child's attorney * * * and brief filed by the Attorney General[5] more persuasive than that of the father's attorney. I also adopt the findings I made in the [permanency] hearing judgment to coincide with the motion to dismiss."

On appeal, father contends that the juvenile court erred in admitting the DIF report to determine that ongoing jurisdiction was warranted for purposes of ruling on father's motion to dismiss.[6] Father argues that the exhibit contained inadmissible hearsay and the rules of evidence apply to a parent's motion to dismiss. *See Dept. of Human Services v. J. B. V.*, 262 Or App 745, 750, 327 P3d 564 (2014) (concluding

---

[5] Both the brief filed by the child's attorney and the brief filed by DHS rely on the DIF report to argue that father had not addressed his violence issues and therefore continues to demonstrate that the threat of serious injury or loss is current.

[6] In regard to father's motion to dismiss, father only objected to the DIF report. Consequently, we address only the admissibility of the DIF report, and not the admissibility of the entire exhibit that father argues is inadmissible on appeal.

that the legislature did not intend for relaxed evidentiary standards to apply to juvenile court's jurisdictional determination in a motion to dismiss). DHS does not argue that the rule is otherwise.

Father is correct that the rules of evidence, including the hearsay rule, OEC 802, applied to the hearing on his motion to dismiss because "the legislature has imposed a significant evidentiary threshold [on] * * * those who * * * seek to make a child a ward of the court * * * by using only competent evidence" in a motion to dismiss a jurisdictional determination. *Id.* at 752. Under OEC 802, "[h]earsay is not admissible except as * * * provided by law." "Hearsay is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3). Here, the DIF report was offered and admitted to prove the truth of statements contained in the report; thus, it was inadmissible under OEC 802. Moreover, DHS does not argue, either below or on appeal, that the DIF report was not hearsay or that it was otherwise admissible under an exception to the hearsay rule. Thus, we conclude that the juvenile court erred in admitting the DIF report to determine whether ongoing jurisdiction was warranted for purposes of ruling on father's motion to dismiss.[7]

DHS argues that "any error in considering the DIF report was harmless, because even without the report, legally sufficient evidence supported the juvenile court's determination that the bases for jurisdiction, in particular father's substance abuse, had not been 'adequately addressed.'" A judgment will be affirmed despite evidentiary error if there is "little likelihood that the particular error affected the * * * verdict[.]" *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). To determine whether there is little likelihood that the error affected the juvenile court's decision to continue jurisdiction over G, we must determine whether

---

[7] DHS argues that "the DIF report had already been received as part of Exhibit 1 at the time of father's objection," therefore, father's "objection * * * came too late." However, Exhibit 1 was admitted when the juvenile court was conducting the permanency hearing and, as mentioned, the juvenile court considered the motion to dismiss separately. Therefore, father's objection to exclude the DIF report was timely.

the improperly admitted evidence could have affected the outcome of the case.

For the juvenile court to maintain jurisdiction, the jurisdictional bases must continue to pose a current threat of serious loss or injury, and there must be a reasonable likelihood that the threat will be realized. *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011). "Put another way, the conditions or circumstances must present a threat of danger—*i.e.*, serious loss or injury—that is current and not speculative." *Dept. of Human Services v. A. R. S.*, 258 Or App 624, 634, 310 P3d 1186 (2013) (The relevant inquiry in determining whether wardship should continue is "whether the conditions that were originally found to endanger a child persist."). In deciding whether continued jurisdiction is warranted, the court must "consider all of the facts in the case before it and * * * consider whether, under the totality of the circumstances, the child's welfare is endangered." *Dept. of Human Services v. W. A. C.*, 263 Or App 382, 394, 328 P3d 769 (2014).

Father argues that DHS "failed to prove that the factual bases for jurisdiction continued to expose [G] to a threat of serious loss or injury likely to be realized." DHS responds that there is sufficient evidence to support the juvenile court's denial of father's motion to dismiss because, more than two years after the birth of G, "father still had not engaged in treatment, and the only evidence of his sobriety was his testimony that he had not used drugs or alcohol since being deported and the fact that he had provided a single negative [urinalysis]," which is "not indicative of recovery."

The problem with DHS's argument is that we cannot tell whether the juvenile court would have reached the same conclusions—that is, whether, under the totality of the circumstances, the conditions that were originally found to endanger G persist—in the absence of the DIF report. The juvenile court relied on the child's attorney's brief and DHS's brief, both of which, in turn, relied on the DIF report, to deny father's motion to dismiss. Moreover, the juvenile court also relied on its findings that it made in connection with the permanency hearing, which discussed the DIF report,

to deny father's motion to dismiss. Consequently, the DIF report is intertwined with the juvenile court's findings in regard to the motion to dismiss, and because the juvenile court did not indicate whether the evidence—independent of the DIF report—was sufficient to warrant jurisdiction over G, we cannot say that the error was harmless.

In sum, we conclude that the juvenile court erred in considering the DIF report to deny father's motion to dismiss and that it was not harmless to admit the DIF report. The appropriate course is to remand this case to the trial court to reconsider father's motion to dismiss in light of the applicable evidentiary rule.

Vacated and remanded for reconsideration of father's motion to dismiss.