Argued and submitted November 3, 2015, resubmitted en banc May 12, vacated and remanded July 27 2016

In the Matter of T. L., Jr.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. L.,
*Appellant.*

Marion County Circuit Court
J130375;
Petition Number 081313LOW1;
A159576

379 P3d 741

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General. With her on the supplemental brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Hadlock, Chief Judge, and Armstrong, Ortega, Sercombe, Duncan, Egan, DeVore, Lagesen, Tookey, Garrett, Flynn, DeHoog, Judges, and Haselton, Senior Judge.

## LAGESEN, J.

This appeal arises from a juvenile dependency case about T. T is three years old and has been a ward of the juvenile court for almost his entire life. The juvenile court took jurisdiction over T because, shortly after his birth, each of T's parents admitted that his welfare was endangered within the meaning of ORS 419B.100(1)(c)[1] by mother's substance abuse and mental health issues, and by father's incarceration and substance abuse. Soon thereafter, the juvenile court placed T, who had been living with mother, in substitute care with the Department of Human Services (DHS). Approximately one year later, the juvenile court found that, notwithstanding efforts by DHS to reunify T with his parents, parents still had not made it possible for T to return safely to them, and, based on that finding, entered a permanency judgment establishing adoption as the permanency plan for T. As a result of that judgment, DHS shifted its efforts from reunifying T with his parents to executing the permanency plan of adoption.

About eight months later, parents moved to terminate the wardship and dismiss dependency jurisdiction, although, at the time, the permanency plan for T remained adoption. Parents acknowledged that they had not remediated the conditions that had led to the juvenile court exercising jurisdiction over T, but argued that those conditions no longer posed a danger to T, because T's paternal aunt (aunt) was available and willing to assist them in parenting T in a manner that would mitigate any risk to T. Noting that our case law is not clear on the point, the juvenile court determined that the evidence about aunt was not relevant to the legal issue presented by a motion to dismiss juvenile court jurisdiction, which the court understood to be narrow: whether the identified bases for jurisdiction contained in the jurisdictional judgment continued.[2] Based on that

---

[1] ORS 419B.100(1)(c) states:

"Except as otherwise provided in subsection (5) of this section and ORS 107.726, the juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and *** [w]hose conditions or circumstances are such as to endanger the welfare of the person or of others."

[2] We acknowledge that the record is ambiguous as to how the juvenile court treated the evidence regarding aunt (which consisted primarily of aunt's

understanding of the law, the court denied the motion, concluding that the original grounds for jurisdiction—mother's substance abuse and mental health issues, and father's incarceration and substance abuse—were still present.

Father has appealed. The issue on appeal is whether the juvenile court erred in denying the motion to dismiss. Concerned about the potential for motions to dismiss like the one at issue in this case to disrupt the permanency process established by the legislature, after this case was submitted to a three-judge department of this court, we took this case into full court to consider two important and recurring questions related to motions to dismiss juvenile court jurisdiction: (1) What is the legal standard governing a motion to dismiss juvenile court dependency jurisdiction and, under that standard, is evidence that another person is available and willing to help parents care for a child—in a way that will mitigate the risks posed by the grounds on which dependency jurisdiction is founded—relevant to the determination of whether dependency jurisdiction continues? And (2) where a juvenile court has entered a permanency judgment changing a permanency plan away from reunification with parents to adoption, or another permanency plan, is a motion to dismiss jurisdiction such as parents' motion cognizable and, if so, what party bears the burden of proof on that motion? As to the second question, we requested and received supplemental briefing from the parties.

For reasons explained below, we answer those questions as follows: (1) On a motion to dismiss dependency jurisdiction, a juvenile court must determine (a) whether the jurisdictional bases pose a current threat of serious loss or injury to the ward, and, if so, (b) whether that threat

---

testimony, the testimony of a DHS worker who was familiar with aunt, and some related exhibits about aunt and her apartment). The court admitted that evidence into the record and, in response to a question from father's lawyer, indicated that it did not view that evidence as merely an offer of proof—something that would have suggested to the parties both that the court viewed the evidence as relevant to the issue before it, and that the court would take the evidence into account in making its decision. However, the court's later explanation of the legal standard that it applied in resolving parents' motion to dismiss indicates that the court thought the evidence not relevant under that standard, and that the evidence did not factor into its decision.

is reasonably likely to be realized. Evidence that another person is able to assist in caring for a child in a way that would mitigate the risk posed by the jurisdictional bases is probative of the second element of that inquiry, and a juvenile court errs when it excludes that evidence or otherwise fails to take it into account in assessing whether dependency jurisdiction continues. (2) If the permanency plan for a child is something other than reunification, a parent seeking dismissal of dependency jurisdiction on the ground that the jurisdictional bases no longer endanger the child bears the burden of proving that the bases for juvenile court jurisdiction no longer endanger the child, unless the proponents of jurisdiction opt not to put them to their burden. In effect, a permanency plan other than return to parent gives rise to a presumption that the child cannot return safely home. If the proponents of ongoing jurisdiction choose to invoke that presumption, a parent seeking dismissal of dependency jurisdiction must overcome that presumption by proving that the parent has ameliorated the jurisdictional bases to the degree that they no longer pose a threat to the child that is reasonably likely to be realized.

## I. LEGAL FRAMEWORK

This case involves a motion to dismiss juvenile court dependency jurisdiction filed after entry of a permanency judgment changing the ward's permanency plan from return to parents to adoption. For that reason, we provide an overview of the statutes governing dependency jurisdiction and those governing permanency proceedings in a dependency case.

Children in Oregon "are individuals who have legal rights." ORS 419B.090(2)(a). Those rights include the right to "[p]ermanency with a safe family"; the right to "[f]reedom from physical, sexual or emotional abuse or exploitation"; and the right to "[f]reedom from substantial neglect of basic needs." Oregon's dependency statutes serve to protect and enforce those rights while, at the same time, safeguarding parents' Fourteenth Amendment liberty interest in parenting their children. ORS 419B.090. To strike a balance between those sometimes competing interests, the statutes provide that Oregon's policy is to remove an endangered

child from his or her parents, but to then make reasonable efforts "to allow [parents] the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time." ORS 419B.090. If, however, parents do not make it possible for their child to return to them, then "the State of Oregon has the obligation to create or provide an alternative, safe and permanent home for the child." ORS 419B.090(5).

To effectuate that legislative policy, ORS 419B.100(1)(c)—the authority on which the juvenile court took jurisdiction over T—permits a juvenile court to take jurisdiction over a child whose "welfare" is endangered by the child's condition or circumstances. The provision states that "the juvenile court has exclusive original jurisdiction of any case involving a person who is under 18 years of age and * * * [w]hose condition or circumstances are such as to endanger the welfare of the person[.]" A child's welfare is "endanger[ed]" within the meaning of the statute if the child is facing a current "threat of serious loss or injury," *and* there is "a reasonable likelihood that the threat will be realized." *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011); *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 651-53, 853 P2d 282 (1993) (concluding that, under ORS 419.476(1)(c), the predecessor to ORS 419B.100(1)(c), a child's "condition or circumstances are such as to endanger" the child's welfare "[i]f, after considering all the facts, the juvenile court finds that there is a reasonable likelihood of harm to the welfare of the child").

Once a juvenile court has taken jurisdiction over a child pursuant to ORS 419B.100(1)(c), the court retains that jurisdiction so long as "the jurisdictional bases [] continue to pose a current threat of serious loss or injury, and there [is] a reasonable likelihood that the threat will be realized." *Dept. of Human Services v. J. V.-G.*, 277 Or App 201, 212, 370 P3d 916 (2016). If, however, the bases for the juvenile court's jurisdiction "cease to exist," then the juvenile court must terminate the wardship and dismiss the case, thereby returning the child to the care and legal custody of the child's parents or legal guardians. *Dept. of Human Services v. A. R. S.*, 258 Or App 624, 310 P3d 1186 (2013), *rev dismissed*, 355 Or 668 (2014).

If a juvenile court places a child in substitute care with DHS (or another substitute caregiver),[3] then the court periodically must review the child's circumstances. The purpose of these reviews is to assess what efforts DHS has made to reunify the family or to achieve another permanent placement for the child and, ultimately, to determine whether jurisdiction should continue. ORS 419B.449(1) (providing for review hearing for court "to review the child or ward's condition and circumstances and to determine if the court should continue jurisdiction and wardship or order modifications in the care, placement and supervision of the child or ward").

Although some dependency cases may resolve quickly, many do not. To help ensure that children do not languish in foster care, Congress enacted the Adoption and Safe Families Act of 1997 (ASFA). ASFA establishes a number of requirements for state juvenile and foster care systems aimed at reducing children's time spent in foster care; these requirements are enforced against the states through Congress's Spending Clause authority. 42 USC §§ 671, 675; *Dept. of Human Services v. T. L.*, 358 Or 679, 689, 369 P3d 1159 (2016).

To comply with ASFA, the Oregon legislature enacted the permanency provisions of the dependency code, ORS 419B.470 to 419B.476. Or Laws 1999, ch 859; *T. L.*, 358 Or at 689. In general, those provisions require a juvenile court to conduct a permanency hearing for a child in substitute care no later than one year after the court took jurisdiction over the child, or 14 months after the child was placed in substitute care, whichever date comes first. ORS 419B.470(2).[4] The primary purpose of the permanency hearing is to determine, or update, the permanency plan for the child and to establish the timetable and conditions for accomplishing that plan. ORS 419B.476(2), (4), (5). After

---

[3] Not all dependency cases result in the child being placed in substitute care. A juvenile court has the authority to place a ward under protective supervision, and leave the ward in the legal custody of the ward's parents, if the court determines that approach is "in the best interest and welfare of a ward." ORS 419B.331.

[4] In some circumstances, the court must conduct the permanency hearing earlier.

the hearing, the juvenile court must memorialize the child's permanency plan and any other required findings in a final order. ORS 419B.476(5).

The permanency hearing is significant because, as the Supreme Court recently has reminded us, it sets the roadmap for the resolution of the dependency case. *T. L.*, 358 Or at 689-93.[5] The permanency plan set by the court determines whether DHS will continue to work to reunify the family or will, instead, direct its efforts towards accomplishing the alternative plan established by the court. *Id.* at 691. If the juvenile court changes a permanency plan from reunification with parents to a different plan, that "change divests the parent of family reunification services as a matter of right from that time forward." *Id.* (citing ORS 419B.476(4)(c)). Also, DHS no longer must make "reasonable efforts" to enable the ward to return safely home, or monitor whether the parents have made sufficient progress to allow the child to return to them. *Id.* at 691-92. In other words, a change in a child's permanency plan from return to parent to some other permanency plan "marks a profound change in the path to finality for children in care." *Id.* at 692. Although the change is not irreversible—ORS 419B.470(5) entitles parents to request new permanency hearings so long as their parental rights have not been terminated—it gives rise to the operating assumption that the child will not be returning to parents: "where [a] court changes a case plan from reunification to a permanent plan such as guardianship or [another planned permanent living arrangement], the parent's status as the preferred placement for the child is effectively terminated, unless and until the plan is changed at a subsequent permanency hearing." *Id.* at 693.

---

[5] In *T. L.*, the issue was whether parents have a right to the adequate assistance of counsel in permanency proceedings and, if so, whether parents may assert a claim of inadequate assistance of counsel in such proceedings on direct appeal from a permanency judgment. To answer those questions, the Supreme Court considered in "some detail the role and nature of permanency proceedings in dependency cases." 358 Or at 689. It ultimately concluded that, in light of complexity and gravity of such proceedings, as well as the need to achieve finality for children, parents had a statutory right to the adequate assistance of appointed counsel in permanency proceeding, and that parents can raise a claim of inadequate assistance of permanency counsel on direct appeal. 358 Or at 693, 702.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

T came within the juvenile court's dependency juris-diction because parents admitted that T's circumstances endangered him within the meaning of ORS 419B.100(1)(c). Mother admitted that T was endangered on the ground that mother had "mental health and substance abuse issues" which had resulted in her not having full legal and physical custody of a different child and which "have not changed or been ameliorated and impair her judgment and interfere with her ability and availability to safely and adequately parent" T. Father admitted that T was endangered by the fact that father's "substance abuse impairs his judgment and interferes with his ability and availability to safely and adequately parent [T] unless treated." Father also admitted that his criminal behavior and related incarceration endan-gered T: "[F]ather's pattern of criminal behavior (including coercion, felony assault, robbery, theft, possession of meth-amphetamine and other controlled substances, and multiple parole and probation violations) and resulting incarceration interferes with his ability and availability to safely and ade-quately parent the child."

At the permanency hearing a year later, the juve-nile court found that not much had changed, notwithstand-ing DHS's efforts to reunify T with his parents, and that T could not be returned safely to his parents. Based on those findings, the court changed T's permanency plan from reunification to adoption.

Eight months later, at the time father filed the motion to dismiss that is the subject of this appeal, things remained pretty much the same.[6] The permanency plan for T remained adoption. At the hearing on the motion to dismiss, mother, through her lawyer, stipulated that she had not ameliorated the substance abuse and mental health issues that she previously had admitted endangered T. Father tes-tified that he remained incarcerated. Although father tes-tified that he had been sober while incarcerated, and that he participated in NA meetings, father admitted that he had not completed any treatment programs for drugs and

---

[6] Father filed the motion to dismiss. Mother joined in that motion.

alcohol in the time since he had admitted that his substance abuse problem, unless treated, impaired his ability to parent T. Father also admitted that he risked relapse without treatment.

Notwithstanding the evidence that neither parent had redressed the conditions that, by their own initial admissions, posed a risk of serious loss or harm to T that was reasonably likely to be realized, father urged the juvenile court to dismiss jurisdiction. Father's theory was that the court should find that parents had mitigated the risk of harm posed to T by enlisting aunt to assist them with parenting T, and that mitigation was to a degree that rendered jurisdiction no longer permissible. Specifically, father argued that DHS could not establish that T remained in danger as a result of father's incarceration and untreated substance abuse issues, given father's "plan" that aunt would assist parents in parenting T in a way that would avert the risks to T to which parents had admitted.

In support of the motion, parents introduced evidence of documents in which they purported to delegate their parenting authority to aunt. Aunt also testified. She explained, in some detail, how she intended to care for T, and how she would protect T from his parents, if necessary for his safety. She testified that she had obtained an apartment and set up a bedroom for T, and would care for him so long as parents were not able to do so. Aunt further testified that she had some experience caring for T before he had been removed from mother's custody, and that she previously had taken steps to protect T from father and mother by calling police more than one time when father and mother "were high and wanted to come near" T. She testified that she would be willing to do so again if she needed to do so in order to ensure that T was not harmed by his parents.

DHS and T both opposed the motion. In addition to eliciting admissions from father that his substance abuse remained untreated, and that he remained incarcerated, DHS called Askey, a DHS worker familiar with aunt and aunt's circumstances to respond to aunt's testimony. Askey testified about the circumstances that had caused DHS to have concerns about aunt's potential to succeed as

a long-term caregiver for T. According to Askey, although aunt herself did not pose a risk to T, aunt would face a significant number of challenges in providing care to T. Aunt worked full time as a manager at a restaurant, but her income from that job barely met her expenses, calling into question whether she had the financial capacity to care for T. Aunt's support network was weak, and her family did not likely have the capacity to help her care for T; although aunt herself had no criminal record, almost all of her family members had criminal records, and aunt herself had been in substitute care as a child. In Askey's view, although aunt was working hard to establish and maintain a healthy (and legal) lifestyle, given aunt's background, aunt was "barely maintaining her own stability of staying out of law enforcement, staying out of child welfare" such that "any little thing that comes into her life will completely disrupt the applecart that she has created and tried to make healthy for her so she's not like her other family members."

After hearing all the evidence, the court explained that it thought the legal question presented by the motion to dismiss was whether "the factual basis that led to the original jurisdiction continues," and that the focus of its inquiry was whether mother had ameliorated her substance abuse and mental health issues, and whether father had ameliorated the condition of being incarcerated and his untreated substance abuse. Noting that all those conditions still were present, the court ruled that the jurisdictional bases "have not been remediated to the point that * * * there no longer exists a current and present risk of harm to [T]." Based on that determination, the court entered an order denying the motion to dismiss.

Father has appealed that order. On appeal, father contends that, on the evidentiary record before it, the juvenile court could not permissibly conclude that T remained in danger as a result of the original bases of jurisdiction, given aunt's testimony about how she would assist parents in caring for T in a way that would protect him from the threat of harm posed by the jurisdictional bases. DHS contends otherwise, arguing that the juvenile court correctly deemed the evidence regarding aunt to be irrelevant to the question

before it, and that the court otherwise correctly determined that jurisdiction continued.

In deciding to take this case into full court, a question arose as to what bearing, if any, a permanency plan for a child, other than reunification, has on the cognizability of a motion to dismiss dependency jurisdiction, and on the allocation of the burden of proof on such a motion. We requested and received supplemental briefing from the parties on those questions. Both parties agree that nothing in the juvenile code categorically forecloses a parent from moving to dismiss dependency jurisdiction after the permanency plan has been changed away from return to parent. DHS, however, argues that a change in a permanency plan away from reunification should shift the burden of proof on a motion to dismiss dependency jurisdiction to parents when the motion is predicated on the theory that parents have remediated the jurisdictional bases sufficiently to permit the child to return safely home. Father disagrees, arguing that the burden of proof should always remain on the proponent of continuing "state interference."

### III.   ANALYSIS

As noted, we allowed full court consideration of this case to address two questions. We address them in turn.

A.   *Legal Standard on a Motion to Dismiss Jurisdiction and Relevance to Evidence of Another Person Able to Assist Parents in Caring for Child*

We first address the legal standard governing a motion to dismiss a juvenile court dependency jurisdiction and whether, under that standard, evidence that another person is available and willing to help parents care for a child in a way that will mitigate the risks posed by the grounds on which dependency jurisdiction is founded is relevant to the determination of whether dependency jurisdiction continues.

The answer to the first part of that question is supplied by our case law. Our cases hold that the legal issue presented by a motion to dismiss dependency jurisdiction involves a two part inquiry. *J. V.-G.*, 277 Or App at 212; *see also A. R. S.*, 258 Or App at 634; *Dept. of Human Services v.*

*J. N.*, 253 Or App 494, 501, 291 P3d 765 (2012), *rev den*, 353 Or 747 (2013) (jurisdiction warranted if child faces threat that is current, and there is a reasonable likelihood that the threat will be realized). The court must determine whether the original bases for jurisdiction continue to pose a current threat of serious loss or injury. *See J. V.-G.*, 277 Or App at 212. If the court determines that they do, it then must assess the likelihood that that risk will be realized. *See id.* In other words, the inquiry is not restricted to whether the jurisdictional bases originally found to endanger the ward continue to be present; the inquiry also requires an assessment of how likely it is that those bases will result in harm to the child's welfare. If there is no reasonable likelihood of harm to the child's welfare in the absence of dependency jurisdiction, there is no basis for dependency jurisdiction to continue. *Smith*, 316 Or at 653 (dependency jurisdiction is warranted if there is a "reasonable likelihood of harm" to child's welfare).

The answer to the second part of the question— whether evidence that another person is available to assist parents in providing care for a child is relevant to the determination of whether dependency jurisdiction continues— is supplied by principles of evidentiary relevance. *Dept. of Human Services v. J. B. V.*, 262 Or App 745, 751-52, 327 P3d 564 (2014) (holding that the rules of evidence apply in the context of a hearing on a motion to dismiss dependency jurisdiction). Whether particular evidence is relevant will, of course, turn on the facts of each case. However, as a general matter, evidence of measures that parents have taken to mitigate any risk posed by particular jurisdictional bases will be probative of how likely it is that risk of harm posed by those jurisdictional bases will be realized if jurisdiction is dismissed and a child is returned to his parents or legal guardians. As a result, a juvenile court must take such evidence into account in making its determination as to whether jurisdiction continues (unless, of course, the rules of evidence otherwise supply a basis for excluding the evidence).

Here, for example, parents have taken the mitigating measure of enlisting aunt's help (or so a factfinder could find). Aunt testified with a fair degree of specificity as to

how she would assist parents in caring for T in a way that would protect him from the threat posed by the jurisdictional bases, and Askey testified as to why aunt might not have the capacity to provide the assistance that she offered. That evidence is probative of the degree of risk posed to T by his parents' substance abuse, mother's mental health issues, and father's incarceration. It tends to show what T's life would be like if juvenile jurisdiction is dismissed and he is returned to his parents. If a factfinder were to find that aunt has the capacity to help parents in the manner that she described in her testimony and that aunt's assistance would eliminate the threat posed to T's welfare by the jurisdictional bases, that factfinder could find that T would not be at risk from the jurisdictional bases. On the other hand, if the factfinder doubted whether aunt would be able to provide the assistance that she was offering, or doubted that that assistance would be sufficient to eliminate the threat posed to T's welfare by father's substance abuse and incarceration, either because parents were not likely to cooperate with the proposed arrangement or for some other reason, the factfinder could find that it was reasonably likely that the threat posed to T's welfare by father's substance abuse and incarceration, and by mother's substance abuse and mental health issues, would be realized.

The juvenile court therefore erred when it determined that the evidence about aunt was not relevant to the legal standard governing parents' motion to dismiss.[7]

B. *Effect of Permanency Plan on Motion to Dismiss Juvenile Court Jurisdiction*

We turn to the second question for which we allowed full court review: whether a motion to dismiss juvenile court jurisdiction, on the ground that a child would no longer be endangered if the child returned to parents, is legally cognizable after the permanency plan has been changed away from reunification and, if so, what party should bear

---

[7] That does not mean that the court is required to be persuaded by aunt's testimony, or that her testimony would preclude the court from determining that the jurisdictional bases continue to pose a threat to T that is reasonably likely to be realized. Whether evidence is persuasive or not is a question for the factfinder. *State v. Johnson*, 335 Or 511, 523, 73 P3d 282 (2003).

the burden of proof on such a motion. The Supreme Court's recent decision in *T. L.* has highlighted for us the significant role that permanency proceedings play in dependency cases. We have not had the occasion to address what bearing a permanency plan other than reunification has on a motion to dismiss jurisdiction like the one brought by parents and, in particular, whether such motions are cognizable and, if so, whether the permanency plan affects which party bears the burden of proof on the motion. This case presents the opportunity to do so. We take that opportunity because of concerns that such motions practice could undermine the permanency process established by the legislature, were we not to address the issue explicitly.

We start by observing that there is an obvious tension—if not an outright inconsistency—between a motion such as parents' and a permanency plan that has been changed from return to parent, *i.e.*, a permanency plan that is no longer reunification. Parents' motion is predicated on the theory that T can return safely to them at this point in time. But, according to the Supreme Court, under the current permanency plan of adoption, parents' "status as the preferred placement for the child [has been] effectively terminated *unless and until the plan is changed at a subsequent permanency hearing.*" *T. L.*, 358 Or at 693 (emphasis added). A motion such as parents' therefore implicitly challenges the permanency plan—and risks derailing it—without requesting the change of plan that otherwise would be needed to restore parents' status as the preferred placement for their child. *See id.* In other words, there is a risk that such motions could be used to circumvent the process that the legislature intended when it enacted ORS 419B.470 to 419B.476.

A motion such as parents' has the potential to disrupt the permanency process in a different way as well. Our cases place the burden of proving that jurisdiction should continue—that is, that the jurisdictional bases continue to pose a current threat of harm that is reasonably likely to be realized—on the proponents of continuing jurisdiction (usually DHS and sometimes, as here, child). *A. R. S.*, 258 Or App at 635. But once a permanency plan has been changed away from return to parent to adoption, guardianship, or

other permanent placement, the legislature has made clear that DHS's primary job is to work to implement that alternative plan (unless the juvenile court has ordered otherwise). *T. L.*, 358 Or at 691-92; ORS 419B.476(2)(b), (c), (4)(b) (discussing efforts that DHS must make when permanent plan is something other than return to parent). DHS no longer must work to reunify the family, and DHS need not monitor parents' progress. *T. L.*, 358 Or at 691-92; *Dept. of Human Services v. C. L.*, 254 Or App 203, 214, 295 P3d 72 (2012), *rev den*, 353 Or 445 (2013) (where permanency plan has been changed away from reunification, inquiry in subsequent permanency hearings is no longer whether DHS has made reasonable efforts to reunify family, or whether parents have made sufficient progress to permit child to return safely home; rather, the pertinent inquiry focuses on whether DHS has made reasonable efforts to timely implement the permanency plan).

This means that, when a permanency plan is something other than return to parent, and DHS is performing its legislatively assigned task of implementing another permanent arrangement for a child, DHS may not have available to it the information about parents' status that it would need to demonstrate that the original jurisdictional bases continue to pose a risk to a child. That, in turn, creates the risk that a dependency case will be dismissed simply because DHS lacked sufficient evidence about parents' current status, even if the child would remain at risk if in his or her parents' care and custody. That would place a child at risk (by returning the child to a home that is, in fact, dangerous) and would prolong the process of achieving a safe, permanent home for the child (assuming the child, in fact, survived the return home to dangerous circumstances).

We are confident that the legislature did not intend for that to happen. The question for us, then, is how to ensure that the procedure for motions to dismiss juvenile court jurisdiction does not undermine the process for permanency contemplated by the legislature at the time that it adopted the provisions to implement ASFA. The legislature has not spoken directly on that point—it has not spoken about motions to dismiss jurisdiction at all. That leaves

it to us to devise a way to best effectuate the legislature's intent. *Cf. State ex rel Juv. Dept. v. Geist,* 310 Or 176, 185, 796 P2d 1193 (1990) (explaining that, in proceeding to terminate parental rights, court "may fashion an appropriate procedure" to vindicate parents' interest in adequate counsel, where the legislature itself did not supply a procedure).

One answer would be to hold that such motions are not cognizable if the permanency plan is something other than return to parent. But neither DHS nor father has suggested that that would be wise, and we have some indications that that is not what the legislature intended. As noted above, until a parent's parental rights to a child are terminated, that parent can ask for, and generally is entitled to receive, a permanency hearing "at any time." ORS 419B.470(5). That suggests that the legislature intended that a parent whose rights have not been terminated would be able to attempt, at any time, to prove that the permanency plan should be changed back to return to parent. *See State v. L. C.,* 234 Or App 347, 350, 228 P3d 594 (2010), *rev dismissed,* 349 Or 603 (2011) (juvenile court's decision to change permanency plan must be supported by a preponderance of the evidence); *Dept. of Human Services v. R. S.,* 270 Or App 522, 527, 348 P3d 1148 (2015) (proponent of change in permanency plan bears burden of proving that plan should be changed). Permitting a parent to move to dismiss jurisdiction on the ground that the child can safely return home at any time up until termination of parental rights is not inconsistent with that intent, so long as the motion is otherwise handled in a way that does not undercut the permanency process.

Additionally, we are mindful that dependency proceedings are equitable, with the objective of ensuring that the child that is subject to them has a safe, permanent home. Although a bright-line rule of procedure barring motions to dismiss jurisdiction, such as parents' motion, unless and until parents secure a change in permanency plan would bring useful clarity to juvenile court procedure, it also would impose a rigid formality that could impede the juvenile court's ability to reach the just and equitable outcome for a particular child. (This may be why the legislature, itself,

has declined to specify a clear procedure for motions to dismiss dependency jurisdiction, leaving a gap for us to fill.)

The other answer—and the one that we think is most consistent with the permanency process adopted by the legislature—is to place, on parents who seek to dismiss dependency jurisdiction, the burden of proving that jurisdiction does not continue. That is, once a permanency plan has been changed away from reunification, a parent seeking dismissal of dependency jurisdiction must prove that the bases for jurisdiction no longer pose a current threat of loss or harm to the child that is reasonably likely to be realized, thereby overcoming the presumption created by the permanency plan that the child cannot return safely to parents.

We think this solution to be consistent with the permanency statutes for three reasons.

First, doing so ensures that the permanency plan is, in fact, taken into account when a parent seeks to dismiss jurisdiction, and is afforded the weight that the legislature plainly intended it to have. That is consonant with the Supreme Court's recognition that a change in the permanency plan "marks a profound change in the path to finality for children in care." *T. L.*, 358 Or at 692.

Second, as the Supreme Court's decision in *T. L.* indicates, a permanency plan, other than return to parent, in effect gives rise to an operating assumption that a child cannot safely return home. By statute, DHS and other parties to the case are entitled to rely on that operating assumption, and to direct their efforts toward finding a permanent arrangement for a child other than return to parent. *T. L.*, 358 Or at 691-92; *C. L.*, 254 Or App at 211-12 (once permanency plan is changed away from reunification, DHS's goal is no longer reunification of the family). Requiring a parent to bear the burden of proof on a motion to dismiss jurisdiction filed after a permanency plan has been changed away from return to parent simply permits DHS (and, in this case, child as well) to rely on that operating assumption in the context of litigating a motion to dismiss jurisdiction.

Said another way, in the context of a motion to dismiss, we think it appropriate to treat that operating

assumption as an evidentiary presumption that a child remains at risk of harm from the jurisdictional bases, one that the proponents of ongoing jurisdiction may invoke in opposition to a motion to dismiss by parents, and one that, if invoked, parents must overcome by proving that the jurisdictional bases no longer pose a reasonable likelihood of harm to the child.[8]

Third, it is consistent with the burden of proof that parents would bear if they had instead moved to change the permanency plan back to reunification. Our case law holds that a juvenile court's decision to change a permanency plan must be supported by a preponderance of the evidence. *L. C.*, 234 Or App at 349 (reversing juvenile court's decision to change permanency plan from another planned permanent living arrangement to adoption where a preponderance of the evidence did not support juvenile court's decision to change plan). As our cases have recognized, that places the burden of proving that a change of plan is warranted on the proponent of the change of plan. *See, e.g., R. S.*, 270 Or App at 527 (DHS, as proponent of change in permanency plan, bore the burden of proving that criteria for changing plan were met). Requiring that parents bear the same burden of proof on a motion to dismiss jurisdiction that they would bear on a motion to change the permanency plan back to reunification aligns the procedure for such motions with the procedure for permanency proceedings, and guards against

[8] We note that this approach also is consistent with the rules of evidence which, as noted, apply to motions to dismiss jurisdiction in dependency proceedings. OEC 311(1)(w) provides that there is a presumption that "[a] thing once proved to exist continues as long as is usual with things of that nature." In turn, OEC 308 provides that, "[i]n civil actions and proceedings, a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

To change the permanency plan away from reunification with parents, DHS was required to prove that in the approximately one-year period between the court's assumption of jurisdiction over T and the permanency hearing, parents had failed to make sufficient progress in addressing the jurisdictional bases to permit T to return safely home, notwithstanding DHS's reasonable efforts to reunify the family. ORS 419B.476(2)(a); *see, e.g., R. S.*, 270 Or App at 527 (stating standard for changing permanency plan away from reunification). Thus, in changing the permanency plan, the juvenile court found, in effect, that the then-existing state of affairs was that the jurisdictional bases pose an ongoing threat to the child's safe return home, such that another permanent arrangement should be found for the child. Parents would have the burden of proving that that same state of affairs no longer exists.

the risk that such motions might be used to undercut it in a way that, ultimately, risks harm to a child and jeopardizes a child's chances to realize safe permanency.

For all these reasons, we hold that, when a parent seeks to dismiss juvenile court jurisdiction at a time when the permanency plan is something other than reunification, the proponent or proponents of ongoing jurisdiction may invoke a presumption, based on the plan, that the jurisdictional bases continue to make it unsafe for the child to return home. If the presumption is invoked, a parent seeking dismissal bears the burden of proving, by a preponderance of the evidence, that the jurisdictional bases no longer pose a current threat of serious loss or harm to the child that is reasonably likely to be realized. If the parent fails to persuade the court on that point, the motion must be denied.

## IV. CONCLUSION

We have concluded that the juvenile court erred when it determined that the evidence regarding aunt was not relevant to its determination whether to dismiss juvenile court jurisdiction. We also have concluded that parents bear the burden of proof on their motion to dismiss, provided that the permanency plan for T remains something other than reunification and that the proponents of ongoing jurisdiction invoke the presumption that we have held that they are entitled to invoke as a result of that permanency plan. In light of the juvenile court's error, and our holding regarding the burden of proof, we vacate and remand for the juvenile court to reconsider the motion to dismiss under these standards.

Vacated and remanded.

**TOOKEY, J.,** dissenting.

This juvenile dependency case presents the question whether, after the juvenile court has adjudicated allegations of conduct by a child's parents that places the child at risk of serious loss or injury that is reasonably likely to be realized, and, accordingly, has taken jurisdiction over the child, the court must consider whether to terminate the wardship as a result of a parent's plan to have someone else parent

the child. The majority holds that, by presenting such a plan, a parent may avoid ameliorating the adjudicated risk-causing conduct but nevertheless require the court to consider whether to terminate the wardship. I disagree. In my view, after the court adjudicates allegations of risk-causing conduct, the appropriate inquiry upon a parent's motion to terminate the wardship is only whether the adjudicated conduct persists or, alternatively, whether that conduct has been ameliorated sufficiently that it no longer poses a risk to the child. Accordingly, I respectfully dissent.

"Juvenile court jurisdiction over a child 'cannot continue if the jurisdictional facts on which it is based have ceased to exist.'" *Dept. of Human Services v. L. C.*, 267 Or App 731, 741, 343 P3d 645 (2014) (quoting *State ex rel Juv. Dept. v. Gates*, 96 Or App 365, 372, 774 P2d 484, *rev den*, 308 Or 315 (1989)). "However, that determination does not include a retrial of the original allegations. *The evidence is limited to whether the conditions that were originally found to endanger a child persist*," *Gates*, 96 Or App at 372 (emphasis added), to the degree that they continue to present a present threat of serious loss or injury that is likely to be realized, *Dept. of Human Services v. J. M.*, 260 Or App 261, 267, 317 P3d 402 (2013).

As explained in the majority opinion, 279 Or App at 681, father does not contend that he has remediated the allegation, to which he admitted, that his "pattern of criminal behavior (including coercion, felony assault, robbery, theft, possession of methamphetamine and other controlled substances, and multiple parole and probation violations) and resulting incarceration interferes with his ability and availability to safely and adequately parent the child." Instead, father argues that, although his incarceration continues (and to the extent that his substance abuse problem continues), jurisdiction is no longer warranted because father proposes for T to live with aunt until father is released and stable enough to be able to safely parent T.

Father's argument is based on the proposition that dependency jurisdiction is not warranted simply because a parent is not able to parent a child independently. *See State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 86, 106

P3d 627 (2005) (in termination of parental rights context, noting that "there is no statutory requirement that a parent be able to care for the child 'independently'"). Father points out that we have held that juvenile courts err in taking jurisdiction, in the first instance, over children who are being safely cared for by family members, notwithstanding that the conduct of the children's parents might expose the children to a risk of harm if the children were in the parents' care. *See Dept. of Human Services v. A. B.*, 271 Or App 354, 364, 350 P3d 558 (2015) (department did not show that child was exposed to a risk of harm where her parents engaged in risk-causing conduct but the child was being cared for by her grandmother); *Dept. of Human Services v. A. L.*, 268 Or App 391, 398, 342 P3d 174 (2015) (children were not exposed to a risk of harm as a result of their parents' risk-causing conduct because they had been parented by their grandparents since infancy); *see also Dept. of Human Services v. B. L. J.*, 246 Or App 767, 770, 268 P3d 696 (2011) (court erred in taking jurisdiction over child whose mother was unable to parent independently because of cognitive deficits, because mother was living with a family friend who could supervise her parenting).

In father's view, that principle, combined with our standard for determining whether dependency jurisdiction continues, means that, when a parent presents an alternative to personally parenting a child who is already within the jurisdiction of the juvenile court, the juvenile court may no longer evaluate whether the parent's adjudicated risk-causing conduct would endanger the child if the child were in the parent's care. Instead, father asserts that the court may evaluate only whether the alternative plan would expose the child to a risk of serious loss or injury likely to be realized. Accordingly, father contends that, here, because he proposed to have T live with aunt, the court should have considered only whether DHS had proved that T "would be exposed to a current risk of serious loss or injury likely to be realized in aunt's care."

I disagree. When a court takes jurisdiction over a child because the child's "condition or circumstances are such as to endanger the welfare of the [child]," ORS 419B.100(1)(c), DHS must allege and prove particular conduct by the caregiver

or others, or other circumstances of the child, that give rise to "a current threat of serious loss or injury that is reasonably likely to be realized," *J. M.*, 260 Or App at 267. The adjudicated allegations provide notice to the parent or caregiver of the steps that he or she will be required to take to ameliorate the risk of harm to the child and thus end the court's jurisdiction. ORS 419B.809(4) (requirement that petition alleging jurisdiction set forth certain facts); *see also Dept. of Human Services v. J. R. L.*, 256 Or App 437, 447, 300 P3d 291 (2013) ("[A] juvenile court cannot base its jurisdictional decision on facts that depart from the petition or jurisdictional judgment when neither the petition nor the jurisdictional judgment would put a reasonable parent on notice of what the parent must do to prevent the state from asserting or continuing jurisdiction over the child.").

By contrast, after jurisdiction is established, the remainder of the dependency proceedings is focused on, and limited by, the adjudicated risk-causing conduct and circumstances. The goal of the dependency proceedings is to ameliorate the adjudicated harms and, if possible, allow reunification of the family. *See* ORS 419B.090(5) ("It is the policy of the State of Oregon * * * to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to *safely return home* within a reasonable time." (Emphasis added.)). That focus on the adjudicated bases for jurisdiction—that is, on the factual conduct or circumstances that expose the child to the risk of serious loss or injury—continues throughout the proceedings. *See, e.g., Dept. of Human Services v. A. R. S.*, 256 Or App 653, 660, 303 P3d 963 (2013) (focus on adjudicated bases at continuation of permanency plan); *Dept. of Human Services v. N. M. S.*, 246 Or App 284, 300, 266 P3d 107 (2011) (focus on adjudicated bases at change of permanency plan); *J. R. L.*, 256 Or App at 449-52 (focus on adjudicated bases at termination of jurisdiction).[1]

---

[1] We have not yet had occasion to consider whether that focus persists during a proceeding to terminate parental rights. *See Dept. of Human Services v. J. C. H.*, 272 Or App 413, 422-23, 358 P3d 294, *adh'd to as modified on recons*, 274 Or App 186, 361 P3d 610, *rev den*, 358 Or 449 (2015) (finding it unnecessary to reach father's contention that focus on the adjudicated bases for jurisdiction continues in a termination of parental rights proceeding).

Thus, on a motion to terminate the wardship, the juvenile court's focus must remain on the adjudicated bases for jurisdiction and the risk of harm from those adjudicated bases. The court must decide whether "the factual bases for jurisdiction persist to the degree that they pose a current threat of serious loss or injury that is reasonably likely to be realized." *J. M.*, 260 Or App at 267; *see also Gates*, 96 Or App at 372 ("The evidence is limited to whether the conditions that were originally found to endanger a child persist."). The court cannot continue jurisdiction based on facts that were not alleged in the petition and included in the jurisdictional judgment. *J. R. L.*, 256 Or App at 447. That would shift the focus to *any* risk of harm to the child, at the cost of straying from the adjudicated facts. Conversely, a parent cannot avoid the necessary inquiry into the persistence of the factual bases for jurisdiction—which, as noted, are the focus of the proceedings after jurisdiction is taken—merely by positing that the child will not be exposed to a risk of harm if he or she is cared for by someone other than the person or people whose care initially exposed the child to the risk. That would impermissibly shift the focus from the adjudicated bases and their effect on the child and from the goal of reunifying the family. It would defeat the statutory purposes of the dependency proceedings.

In the majority's view, evidence that another person is now available to care for the child is relevant to the question whether "the factual bases for jurisdiction persist to the degree that they pose a current threat of serious loss or injury that is reasonably likely to be realized." *J. M.*, 260 Or App at 267. The majority asserts that evidence unrelated to the persistence of the factual bases for jurisdiction, and unrelated to the risk to the child that those factual bases for jurisdiction would present if the child were under the parents' care, is nevertheless relevant to the court's assessment of "how likely it is that [the] risk of harm posed by [the adjudicated] jurisdictional bases will be realized if jurisdiction is dismissed." 279 Or App at 685.

The majority assumes that, in considering whether a risk is likely to be realized, we must evaluate the risk to the child from the conditions and circumstances that would exist if jurisdiction were to end immediately, even if the

child's living situation, in the absence of jurisdiction, would be entirely different from the one out of which the child was originally taken—and even if that living situation would be entirely new to the child and would not involve either parent. Thus, in the majority's view, whenever a parent proposes a new living situation for a child during an ongoing dependency proceeding, evidence about that living situation is relevant to the question of risk and the court must evaluate whether that new living situation would, in fact, exist in the absence of jurisdiction and whether it would pose a risk to the child.

As I have explained, however, the relevant statutory goal of the dependency process is to allow parents and guardians "the opportunity to adjust *their* circumstances, conduct or conditions to make it possible for the child *to safely return home* within a reasonable time." ORS 419B.090(5) (emphases added)). That statutory focus on the child's "return home" indicates that the question for the court upon a motion to dismiss is limited to whether the adjudicated conduct and circumstances persist and whether that conduct or those circumstances would still pose a risk to the child if the child were in the care of a parent or another person from whom the child was taken. That is, the court must evaluate whether the child can "safely return home." Accordingly, our cases consider whether the adjudicated circumstances of the parent have been remediated or whether, even if the adjudicated conduct or circumstances of the parent persist, they no longer persist to such a degree that they would pose the requisite risk to the child if the child were in the parent's care. *See, e.g., L. C.*, 267 Or App at 744-45 (mother remediated adjudicated conditions and circumstances by ending contact with the abusive father, successfully parenting children on her own, and participating in domestic violence services); *Dept. of Human Services v. A. R. S.*, 258 Or App 624, 636-37, 310 P3d 1186 (2013), *rev dismissed*, 355 Or 668 (2015) (mother's residential instability and choice of unsafe partners persisted at time of motion to dismiss but DHS failed to show any risk to child from those circumstances if child were to live with mother); *cf. B. L. J.*, 246 Or App at 770 (alleged circumstances of parent had been remediated by the time of the jurisdictional hearing where mother was unable to parent independently because of cognitive deficits

but, by the time of the jurisdictional hearing, mother was living with a family friend who could supervise her parenting). We have never decided that an entirely new living situation for the child would cut off the adjudicated risk of harm from the otherwise unameliorated conduct and circumstances of the parents. *See Gates*, 96 Or App at 372 ("The evidence is limited to whether the conditions that were originally found to endanger a child persist.").

Neither the statutes nor our case law indicate that, upon a parent's proposal of an alternative living situation for the child—one that does not involve a parent and may not involve a relative at all—the juvenile court must consider whether, if the child were to "return home" to that person or people, the parent's adjudicated conduct or circumstances would pose a risk to the child. The statutory focus of the proceedings is to remediate the problems of the parents identified in the jurisdictional judgment and, thus, to eliminate the risk to the child from the parents' care. In short, after the court has adjudicated conduct or circumstances that already have put the child at risk of a serious loss or injury likely to be realized, it is too late for the parent to propose an alternative living situation that could have protected the child from the risk.

Father points out that, in cases where one parent lives out of state or was otherwise absent when jurisdiction was established, we have held that juvenile courts must terminate jurisdiction if DHS fails to prove that the child will be endangered if the previously absent parent takes physical custody of the child. *See, e.g., Dept. of Human Services v. J. R.*, 274 Or App 107, 113, 360 P3d 531 (2015) (failure of proof that father would be unable to protect the children from mother without a custody order required termination of jurisdiction). In father's view, the fact that courts must consider the risk to the child in the care of a parent other than the one whose conduct originally endangered the child means that courts must also consider the risk to the child in the care of any person that a parent presents as a potential caregiver.

That argument fails to account for the unique nature of parent-child relationships. Courts have an obligation to

consider whether return to either of a child's parents, in their current living situation, is safe for the child. *Dept. of Human Services v. W. A. C.*, 263 Or App 382, 392-94, 328 P3d 769 (2014) (accepting DHS concession that, "'if a child has a parent capable of caring for him safely, juvenile court jurisdiction is not warranted'"); *see also, e.g., Dept. of Human Services v. D. A. S.*, 261 Or App 538, 548-49, 323 P3d 484 (2014) (jurisdiction no longer warranted based on father's lack of a custody order where there was no evidence that mother's circumstances continued to pose such a risk to the child that the lack of a custody order presented a reasonable likelihood of danger to the child if the child were in father's care); *cf. B. L. J.*, 246 Or App at 770 (juvenile court erred in failing to consider fact that mother with cognitive deficits was living with family friend who could supervise her parenting). That requirement is grounded in the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Troxel v. Granville*, 530 US 57, 66, 120 S Ct 2054, 147 L Ed 2d 49 (2000) (the Due Process Clause protects "the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); ORS 419B.090(4) ("It is the policy of the State of Oregon to guard the liberty interest of parents protected by the Fourteenth Amendment to the United States Constitution * * *."). Thus, the fact that a court must consider whether a child can safely be reunited with either parent, including a parent who was not caring for the child when jurisdiction was established, does not demonstrate that the court must also consider whether it is safe to "reunite" a child with a nonparent whenever a parent expresses an intention to place the child with a nonparent.

The juvenile dependency statutes contemplate that, after the juvenile court adjudicates conduct or circumstances that endanger the welfare of a child, the court's subsequent evaluation of whether jurisdiction continues to be warranted will be focused on deciding whether the adjudicated allegations persist to the degree that they endanger the child. Father's proposal for T to live with aunt had no bearing on whether father's substance abuse problem and criminal behavior and resulting incarceration persisted to the degree that they would pose a risk of serious loss or injury that

was reasonably likely to be realized if T were returned to father's care. Because those jurisdictional grounds persisted and continued to pose a risk of serious loss or injury to T, I would hold that the juvenile court did not err in continuing jurisdiction and denying father's motion to terminate the wardship. Accordingly, I respectfully dissent.

Armstrong, Sercombe, and DeVore, JJ., and Haselton, S. J., join in this dissent.