Argued and submitted September 30, reversed and remanded
December 24, 2014

In the Matter of W. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

L. C.,
*Appellant.*

Hood River County Circuit Court
J1304001; A157119 (Control)

In the Matter of E. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

L. C.,
*Appellant.*

Hood River County Circuit Court
J1304101; A157120

In the Matter of S. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

L. C.,
*Appellant.*

Hood River County Circuit Court
J1304201; A157121

343 P3d 645

Sarah Peterson, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Inge D. Wells, Assistant Attorney in Charge, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Lagesen, Judge, and De Muniz, Senior Judge.

DUNCAN, P. J.

## DUNCAN, P. J.

In this consolidated juvenile dependency case, mother appeals the juvenile court's judgment continuing jurisdiction over her three children, W, E, and S. As detailed below, the court initially asserted jurisdiction over the children based on father's domestic violence and the family's homelessness. At the time, W was three years old, E was two years old, and S was nine months old. After the court took jurisdiction, mother and the children moved into a domestic violence shelter, where mother participated in a support group for victims of domestic violence. Several months later, mother and the children moved into their own home. Approximately one month after that, mother made a motion to dismiss the court's jurisdiction. The court denied the motion on the ground that continued state supervision of the family was necessary because mother and father planned to reunite the family if and when allowed to do so. As explained below, we conclude that the court erred in denying the motion because the record does not contain sufficient evidence that, at the time of the hearing on the motion, the factual bases for jurisdiction persisted to the degree that they posed a current threat of serious loss or injury that was reasonably likely to be realized; specifically, the record does not contain sufficient evidence that it was reasonably likely that mother would fail to protect the children from serious loss or harm from domestic violence. Therefore, we reverse and remand.

### HISTORICAL AND PROCEDURAL FACTS

Although we have discretion to exercise *de novo* review in this case, neither party requests that we exercise that discretion, and we decline to do so. ORAP 5.40(8)(c) (stating that we exercise *de novo* review only in "exceptional" cases). Accordingly, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). Stated in accordance with that standard, the relevant facts are as follows.

Mother and father are married and have three children, W, E, and S. On June 11, 2013, father pleaded guilty

to one count of fourth-degree assault constituting domestic violence for causing physical injury to mother and, at sentencing on June 18, 2013, he was placed on probation.[1]

Approximately three months later, on September 7, 2013, mother called the Department of Human Services (DHS) and told an on-call worker that father had thrown a game piece at her head, causing bleeding and swelling. Mother also told the caseworker that she and the children had left the family home in order to give father a chance to calm down and that they were safe at a friend's home. The worker told mother to remain where she was until a deputy could interview her. Mother did. After speaking with mother and a probation officer, the deputy issued father a citation to appear in court.

During the following week, DHS investigated the family. DHS caseworkers interviewed mother and father, among others. According to a DHS report, both parents initially "provided very minimal responses to questions[,]" but mother eventually told a caseworker that there had been "more than twenty" incidents of domestic violence against her by father. She also told a caseworker that there had been "approximately thirty" incidents to which the children should not have been exposed. Mother reported that the oldest child, W, had been injured during one of the incidents.

Father told a caseworker that he had been in a car accident in 2005 and had suffered serious injuries, including a head injury, and was in a coma for several weeks. Following the accident and coma, father experienced severe memory problems and a personality change.

On September 13, 2013, DHS took the children into protective custody. The next day, September 14, 2013, mother moved into a domestic violence shelter. Two days later, on September 16, 2013, a hearing was held and the juvenile court approved the temporary placement of the

_____

[1] It is apparent from the record and the briefing that the parties and juvenile court were aware of, and do not disagree about, father's conviction and probation. However, the specific crime of conviction and dates of his plea and sentencing are not in the record. At the state's request, we take judicial notice of the crime and dates from the court register of father's criminal case.

children in foster care. Mother informed the court that she was willing to take the children to a safe place away from father and cooperate with DHS. Father was arraigned on a probation violation and taken into custody.

Approximately one week later, on September 25, 2013, mother underwent a mental health assessment by a mental health therapist. The therapist expressed concern about mother's minimization of father's domestic violence and opined that mother's prognosis without treatment was "poor." But the therapist left it up to mother to decide whether to pursue counseling because, in the therapist's view, it was important for mother, as a domestic violence survivor, "to have opportunities to choose, to be empowered, and to know that she is an adult with valid rights, feelings, and opinions." According to a DHS report, mother participated in "a couple" of individual counseling sessions in October 2013.

On October 14, 2013, one month after the children were taken into protective custody, the juvenile court asserted jurisdiction over them based on father's domestic violence, the family's homelessness, and the parents' need for state services to adequately parent the children. *See* ORS 419B.100(1)(c) (providing for juvenile court jurisdiction over a child "[w]hose condition or circumstances are such as to endanger the welfare of the [child]"); ORS 419B.100(1)(d) (providing for juvenile court jurisdiction over a child "[w]ho is dependent for care and support on a public or private child-caring agency that needs the services of the court in planning for the best interest of the [child]").

The jurisdictional judgment states that mother admitted to the following allegations, copied from the petition for jurisdiction that DHS filed regarding W:

"* * * There is a history of domestic violence in said child's home, committed in her presence, which endangers the child's emotional and physical welfare.

"* * * The child's mother has not taken measures to protect herself and the child from the father's violence.

"* * * Said child has suffered physical injuries to wit: an injury on her neck, while in the care, custody, and control of the child's mother.

"* * * * *

"* * * The child's mother needs the services of the Court and State to adequately parent and care for this child.

"* * * Said child's mother and father are homeless and lack safe and stable shelter for the child."[2]

The judgment also states that father admitted to similar allegations, as well as the following additional allegations:

"* * * The child's father has a history of using violence in the home against the child's mother, has exposed the child to this violence, and has yet to complete court-ordered intervention designed to lessen the threat of domestic violence in the child's home.

"* * * The child's father has mental health difficulties that tax and compromise his ability to adequately parent.

"* * * Said child's father has been physically abusive to the child.

"* * * Said child's father has a history of criminal behavior and incarceration that disrupts and compromises his ability and availability to adequately and appropriately parent."

After the jurisdictional hearing, the children, who had been in foster care, were returned to mother's care and went to live with her in the domestic violence shelter. While mother and the children were at the shelter, mother voluntarily attended weekly domestic violence support group meetings at the shelter. In a letter dated December 16, 2013, the counselor who led the meetings, Harvey-Smith, reported that mother had actively participated in the meetings and had shown "a thorough understanding of the domestic violence cycle and the negative impact that it has on children." Harvey-Smith also opined that mother had "demonstrated exceptionally strong parenting skills and * * * [had] the confidence and knowledge to protect her children from domestic violence."

---

[2] Although DHS filed separate petitions for each of the three children, the juvenile court entered a single judgment in response to the petitions. In the judgment, the court quoted the allegations set out in the petition regarding W. One of the allegations relates only to W; she is the only child that father physically injured.

In December 2013, after meeting with mother, father, and the children, and in consultation with father's probation officer, DHS approved contact between father and the children through exchanges of photos, letters, drawings, and video recordings, all of which had to be approved and delivered by DHS. From that point on, father and the children exchanged such documents on a regular basis. Mother facilitated the exchanges by dropping off and picking up the documents at the DHS office.

In January 2014, mother participated in a psychological evaluation. The psychologist who conducted the evaluation reported that mother's "child abuse potential" was "low" and that mother "was not showing symptoms of any mental health or substance abuse disorder." The psychologist recommended that mother participate in mental health counseling for domestic violence and continue to get support from domestic violence groups.

According to a DHS report, mother participated in "a couple" individual counseling sessions after the psychological evaluation. According to mother's attorney, mother and the counselor discussed "boundaries and a safety plan." They also discussed "discharging from counseling services" after the counselor said that mother "didn't need [them] anymore." Neither mother nor the counselor consulted DHS about ending the counseling.

Father was released from custody in January 2014, and he moved to Wenatchee, Washington for work. He requested that his probation be transferred from Oregon to Washington, and both he and his probation officer thought the request would be approved because he had a full-time job and a place to live in Washington.

According to a DHS report, father "stayed busy" after his release. "Despite working a full-time construction job," father completed "several evaluations" by the end of April 2014, including a mental health assessment (which he arranged on his own), a domestic violence risk assessment, and a neuropsychological evaluation. Father also participated in weekly domestic violence group counseling as part of a year-long domestic violence treatment program. According to the doctor who facilitated the sessions,

Dr. Chacon, father was an attentive and active participant, but seemed to minimize his abusive behavior and its effects.

In April 2014, father submitted to a domestic violence risk assessment administered by Chacon. Chacon reported that father "scored high on the violence scale" and was "at high risk of committing further violent acts and should be considered dangerous[.]" Chacon recommended that father complete the year-long domestic violence treatment program that he had already begun.

Father had to suspend his participation in treatment briefly after Washington denied his request to transfer his probation and informed him that it would not reconsider the request until father moved back to Oregon for at least 45 days. Father then moved to Oregon and, by the time of the review hearing, had begun treatment here.

As a condition of his probation, father is prohibited from having any contact with mother, unless authorized by his probation officer, and father's probation officer does not intend to allow any contact until father completes treatment. According to DHS, mother and father would like to have contact with each other, but they have abided by the "no contact" condition.

In early April 2014, mother and the children moved into an apartment. Mother receives financial assistance that enables her to pay the rent. According to a DHS report dated May 7, 2014, the apartment was "spacious and clean and full of age-appropriate and educational toys" and "[n]o safety concerns were noted." The children appeared "healthy, clean, and well-cared-for[,]" and were "making appropriate developmental gains." They were bonded with mother, and mother demonstrated "strong parenting skills." The children were "happy and relaxed" in mother's care and they "mind[ed] her well." The report also states, "Overall, DHS is pleased with [mother's] care of the children."

On May 12, 2014, the juvenile court held the review hearing that gave rise to the judgment that is the subject of this appeal. At the hearing, mother made an oral motion for dismissal of the court's jurisdiction over the children.

She asserted that, in the seven months since the court had taken jurisdiction, she had "completed everything that's been asked of her" and that there was not a "current threat of serious loss or injury that is reasonably likely to be realized anymore." She further asserted that "it doesn't make sense to keep this case open just so we wait to see what [father] * * * can accomplish and when he can accomplish it." She told the court that she would work with father's probation officer to arrange supervised visits with the children if and when the probation officer allowed such visits. She explained that she understood that she and the children could not have unauthorized contact with father and that, if they did, father could be returned to custody for violating his probation.

For its part, DHS asserted that continued jurisdiction was justified because, in light of the fact that mother and father planned to reunify the family, DHS involvement was necessary "for a considerable period of time" to monitor father's progress in treatment, visits with the children, and return to the family home. In a report written before the review hearing, DHS explained:

"The parents are clear with DHS they plan to remain married and to reunite as a family as soon as allowed by the Court. [Father] has been participating in his domestic violence treatment for a couple of months, but he has a long way to go before he completes treatment, and treatment is now unfortunately on hold. DHS will need to hear from his treatment provider not only that he has completed the year's worth of treatment required due to his conviction, but that he has significantly benefitted from treatment and is demonstrating the new skills he has learned. DHS will need to hear that he is low-risk to reoffend and that he is safe to reunite with his family under the supervision of DHS. DHS will need to monitor in-person visits between [father] and his children to see how these go before he reunites with his family, and * * * DHS will need to monitor the children's safety in Oregon once he is able to return to the family home here."

The juvenile court agreed and denied mother's motion, stating that "what's in the best interests of the children is for them to get to know their dad, to be living with

their mom, to ultimately reunify the family, and to have the protection that DHS can afford by way of supervision." The court also stated that it did not believe that mother should supervise father's visits with the children because mother had failed to protect them from father's domestic violence in the past. The court entered a judgment continuing jurisdiction, and mother appeals.

## ARGUMENTS ON APPEAL

Mother argues that DHS failed to present legally sufficient evidence at the review hearing to support continued juvenile court jurisdiction over the children. She contends that, although the court initially took jurisdiction over the children on numerous bases, at the time of the hearing, "the only remaining basis related to mother's failure to protect the children from domestic violence," and that DHS failed to present legally sufficient evidence that "father's domestic violence would likely recur and mother would again fail to protect the children, thus exposing them to a risk of serious loss or injury."

In response, DHS argues that there was legally sufficient evidence to support continued jurisdiction over the children based on father's domestic violence and mother's failure to protect the children because, at the time of the review hearing, "there were several unanswered questions: (1) would father complete treatment; (2) would that treatment enable him to control his violent behaviors; and (3) if not, could mother act protectively?" DHS asserts that, because father's rehabilitation was uncertain and mother had minimized father's conduct in the past and wanted to reunite the family in the future, there was sufficient evidence that "the bases for jurisdiction persisted" at the time of the hearing.

Thus, as framed by the parties, the issue on appeal is whether the record contains legally sufficient evidence for the juvenile court to continue its jurisdiction over the children, pursuant to ORS 419B.100(1)(c), on the ground that the children's welfare was endangered because it was reasonably likely that father would engage in domestic violence and mother would fail to protect the children.

## DISCUSSION

Whether jurisdiction is authorized by ORS 419B.100(1)(c) depends on whether, under the totality of the circumstances, the child's welfare is endangered. *DHS v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010). "The requirement that the child be endangered is significant; the child must be exposed to 'danger,' that is, conditions or circumstances that involve 'being threatened with serious loss or injury.'" *Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 616 (2012) (quoting *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011)). "Moreover, that threat must be current; it is not sufficient for the state to prove that the child's welfare was endangered sometime in the past." *M. Q.*, 253 Or App at 785 (internal quotation marks omitted). "The threat of serious harm to the child also cannot be speculative. Rather, there must be a reasonable likelihood that the threat will be realized." *Id.* (internal quotation marks omitted). Thus, in order for a juvenile court to take jurisdiction over a child pursuant to ORS 419B.100(1)(c), the child's condition or circumstances must give rise to a current threat of serious loss or injury that is reasonably likely to be realized.

Juvenile court jurisdiction over a child "cannot continue if the jurisdictional facts on which it is based have ceased to exist." *State ex rel Juv. Dept. v. Gates*, 96 Or App 365, 372, 774 P2d 484, *rev den*, 308 Or 315 (1989). When, as in this case, a parent moves to dismiss the juvenile court's jurisdiction at a review hearing, DHS bears the burden of proving that continued jurisdiction is warranted. To satisfy that burden in a case where jurisdiction is based on ORS 419B.100(1)(c), DHS must prove "that the factual bases for jurisdiction persist to the degree that they pose a current threat of serious loss or injury that is reasonably likely to be realized." *Dept. of Human Services v. J. M.*, 260 Or App 261, 267, 317 P3d 402 (2013); *see also Dept. of Human Services v. A. R. S.*, 258 Or App 624, 635, 310 P3d 1186 (2013), *rev dismissed*, 355 Or 668 (2014). In other words, DHS must prove that the factual bases for jurisdiction continue to "present a threat of danger—*i.e.*, serious loss or injury—that is current and not speculative." *A. R. S.*, 258 Or App at 634.

Because juvenile court jurisdiction over a child must be based on a current and non-speculative threat, it cannot be based on a parent's past problems, absent evidence that the problems persist and endanger the child. *M. Q.*, 253 Or App at 787. On this point, *M. Q.* and *J. M.* are instructive.

In *M. Q.*, we held that evidence that the father had abused methamphetamine in the past and had failed to complete drug treatment was insufficient to support jurisdiction over the father's child when there was no evidence that the father had used drugs in the year preceding the jurisdictional hearing. 253 Or App at 786-87. In doing so, we rejected DHS's argument that jurisdiction was justified because it was likely that the father would relapse into methamphetamine abuse. That argument was based on a DHS caseworker's testimony that "she had worked with many drug-affected parents and could not recall any situations in which a parent had been able to overcome a methamphetamine addiction without treatment." *Id.* at 782. In rejecting the argument, we explained that

> "[the caseworker's] generalized lay observation is not enough, standing alone, to support an inference that father is reasonably likely to relapse in a way that is reasonably likely to endanger the child, as it is not tied to any evidence related specifically to father. *In the absence of relevant, individualized evidence about father's current circumstances, the juvenile court erred in asserting jurisdiction on the basis of any concern about his potential for relapse.*"

*Id.* at 787 (emphasis added). Thus, *M. Q.* establishes that jurisdiction cannot be based on generalizations about the risk of recurrence of certain types of conduct.

In *J. M.*, the juvenile court took jurisdiction over the father's two children based on the father's use of illegal corporal punishment against one of them. 260 Or App at 263. After the court took jurisdiction, the father—who believed that physical discipline was supported by biblical scripture—worked with a parent trainer, "who assisted him in reevaluating his views regarding physical discipline." *Id.* at 263-64. The father also "regularly attended visits with the children and completed a parenting-education class with a grade of 105.3 percent." *Id.* at 264. Nevertheless, a

psychologist who evaluated the father opined that the father "lacked insight into the effects of physical punishment on his children" and that "[o]ld patterns of behavior [would] continue as soon as authorities leave." *Id.* The psychologist based his opinion on his belief that the father had failed "to internalize the social norms against inappropriate corporal punishment." *Id.* at 268.

At a review hearing, the father moved to dismiss the juvenile court's jurisdiction over the children and testified that, "although he still believe[d] that some physical discipline [was] an option under Christian scriptures, he would not use it" because, among other reasons, he did not want to risk losing his children. *Id.* at 265. The trial court denied the motion and, on the father's appeal, we reversed. We explained that the "dispositive question" was what the father "[was] likely to *do*." *Id.* at 268 (emphasis in original). We further explained that, even assuming that the father had failed to internalize social norms against corporal punishment, that fact would not make it reasonably likely that he would violate those norms. *Id.* at 268-69. Accordingly, we concluded that DHS had failed to carry its burden of proving that "[the] father—contrary to his own assertion, self-assessment, and outstanding completion of a parent education class—pose[d] a current threat of serious loss or injury that [was] reasonably likely to be realized." *Id.* at 269. Thus, *J. M.* establishes that, in order to continue jurisdiction based on a parent's past conduct, it must be reasonably likely that the parent will engage in that conduct again and will do so in a way that will put the child at risk of serious loss or injury. Evidence that a parent has not fully acknowledged the extent or consequences of his or her past endangering conduct can be a basis for continued jurisdiction only if there is evidence that the parent's failure to do so makes it likely that the parent will engage in the conduct again.

With that statutory and case law in mind, we return to the evidence in this case. As recounted above, the undisputed evidence before the juvenile court was that mother herself brought the family to the attention of DHS when she called to report that father had thrown a game piece at her. Following that call, a deputy interviewed mother and DHS investigated the family. Mother minimized father's

conduct at first, but eventually admitted that father had used violence against her approximately 20 times and there had been approximately 30 incidents to which the children should not have been exposed. After the juvenile court took jurisdiction over the children, mother moved into a domestic violence shelter, where she lived with the children for several months. She submitted to a mental health assessment and participated in some individual counseling. While at the shelter, mother regularly participated in weekly domestic violence support group meetings. After mother had done so for approximately two months, the group counselor reported that mother had shown "a thorough understanding of the domestic violence cycle and the negative impact that it has on children" and had "demonstrated exceptionally strong parenting skills and [had] the confidence and knowledge to protect her children from domestic violence." Mother later submitted to a psychological evaluation, followed by some individual counseling and continued participation in domestic violence support group meetings. After seven months at the shelter, mother and the children moved into their own residence, for which mother was able to pay the rent. By DHS's own report, mother was parenting the children well; they were healthy, making developmentally appropriate gains, and happy in her care.

DHS was pleased with mother's parenting; it sought continued supervision based only on the possibility that father would engage in domestic violence and mother would fail to protect the children. Undeniably, mother had failed to protect the children in the past, but, as discussed, continued jurisdiction cannot be based on a parent's past conduct, absent individualized evidence that the parent's conduct is likely to recur and endanger the child. In some cases, evidence of a parent's pattern of relapse may be sufficient to establish that it is reasonably likely that the parent will relapse again, but in this case there is no evidence of such a pattern.

Mother planned to reunite with father if and when allowed to do so, but evidence of that plan is insufficient to support a conclusion that, at the time of the review hearing, there was a nonspeculative, current threat of harm to the children that justified continued jurisdiction. It is

undisputed that mother and father had abided by the restrictions on the contact between them and between father and the children, and that, if the juvenile court dismissed jurisdiction, father would still be subject to the conditions of his probation regarding contact with mother and the children.

In sum, by the time of the review hearing, mother had demonstrated that she could parent the children on her own and abide by a requirement not to have contact with father. She had also participated in domestic violence counseling and domestic violence support group meetings. We conclude that, given mother's actions after the court took jurisdiction, there was insufficient evidence to support a conclusion that, at the time of the review hearing, the factual bases for jurisdiction persisted to the degree that they posed a current threat of serious loss or injury that was reasonably likely to be realized.

Reversed and remanded.