HADLOCK, P. J.
*750 Mother appeals a juvenile court judgment asserting dependency jurisdiction over her 12-year-old, E, on the basis that mother's mental health problems impair her parenting ability. Mother contends that the record in the juvenile court proceeding does not include evidence sufficient to establish that, at the time of the dependency hearing, her mental health challenges put E at risk of serious harm or loss that was reasonably likely to be realized. For the reasons set out below, we agree that the record in this case is not sufficient to justify the juvenile court's exercise of dependency jurisdiction. Accordingly, we reverse.
Mother has not requested de novo review and this is not an exceptional case in which such review would be appropriate. Accordingly, in reviewing the juvenile court's judgment, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." Dept. of Human Services v. N. P. , 257 Or. App. 633, 639, 307 P.3d 444 (2013). We are bound by the juvenile court's explicit and necessarily implied findings of historical fact as long as any evidence in the record supports them. Id. at 639-40, 307 P.3d 444. We describe the facts consistently with those standards.
*94 Mother has longstanding mental health issues. By her own report, she has been a patient at Western Psychological and Counseling Services since she was nine years old. Her treatment provider since November 2016 is psychiatric nurse practitioner Rosanski, who manages mother's medications. Those medications are for several diagnosed conditions, including bipolar disorder, post traumatic stress disorder (PTSD), and attention deficit disorder. At the dependency hearing, mother, testified about her PTSD, which she said was caused by having been violently victimized. Mother acknowledged that she has "a long list" of additional diagnoses, but she was not able to identify what all of them are. Nor did mother recall the names of all of her medications.
*751 On the evening of April 2, 2018, mother had what she later described as a "mental breakdown." Mother mistakenly thought that somebody had intruded or was attempting to intrude into the apartment where she and E lived. She thought she heard a drill and believed that "somebody was trying to get in the house." Mother, describing herself as having been "very paranoid," "went in attack mode," and started throwing things at the imagined intruder, to protect herself and E. Mother took E to a neighbor's apartment, stayed there for about 15 minutes, then went to another neighbor's apartment for a similar length of time before returning home. At that point, E was tired, upset, and crying.
Mother called 9-1-1 a few times and, because she did not believe that police were responding quickly enough, falsely stated that she had slit her own throat. Mother also called father, with whom she was in frequent contact although they had separated a few years earlier. Father described mother as "kind of freaking out" that night and "talking erratically." Mother asked father to come get her and E so he could move them into his home. In a second phone call, mother said that father needed to come get E, but she did not explain why. However, given how mother was speaking and how frustrated she seemed, "it seemed like a major emergency" to father. E then called father, who testified that she "was crying, and she was scared."
Police officers and personnel from the Department of Human Services (DHS) responded to mother's 9-1-1 calls. Officers took mother to a hospital, where she received treatment for a few days. She then checked herself in to another facility "because [she] still wasn't okay." Mother stayed there for two or three weeks, leaving earlier than staff wanted her to because she wanted to see E.
DHS filed a dependency petition shortly after the April 2 episode, alleging that mother's mental health problems impaired her parenting ability, that her resulting behaviors created a risk of harm to E, and that she was not available as a parenting resource because she was hospitalized. DHS also alleged that child could not safely be *752 placed with father, who had been charged with three counts of third-degree sexual abuse against a minor.[1]
The dependency petition was adjudicated at a June 2018 hearing. At that hearing, mother acknowledged that her conduct on April 2 had scared and upset E; "it freaked her out." Mother testified that she "[a]bsolutely" had mental health issues that night and now realizes that "there was nobody in the apartment, and [she] was probably hearing things." She said that she had not previously had any episodes like the one on April 2 and has not had any since then. Mother testified that she takes her medication faithfully and was taking it at the time of her breakdown. Mother also asserted that she is now making appointments for therapy, including family counseling with E. Mother answered affirmatively when the DHS attorney asked whether that counseling was necessary for her and E to have a healthy parent-child relationship.
Rosanski testified that mother's behavior on April 2 was consistent with her diagnoses; he agreed with mother's characterization of the event as "a breakdown." Rosanski has had two medication-management appointments with mother since April 2 and increased the dosage of one of her medications.
*95 Rosanski had most recently seen mother on May 2 because she missed two appointments in the weeks before trial, which caused him concern. However, mother had missed appointments before and had made them up quickly. At the time of trial, mother had an appointment with Rosanski scheduled for the following week.
Rosanski testified that the April 2 incident was the only time that mother had reported hallucinating sounds or voices. Rosanski has not seen mother decompensate in a similar way on other occasions, and he believes that he would have been made aware of that if it had happened. Mother has not had other psychiatric hospitalizations while she has been his patient. Rosanski believes that mother will decompensate if she does not take her medications; he also believes that mother would benefit from a psychological *753 evaluation and talk therapy. However, he testified that nothing but speculation would lead him to believe that mother will in fact again decompensate in the way that she did on April 2.
Father testified at the dependency hearing that he had seen "behavior like that" with mother in the past, when she was drinking or taking drugs, but "not to that extent." When asked to describe mother's previous behaviors, father discussed a night when mother woke him up because she thought a man was going to try to break into their house; when father looked outside, nobody was there. Father did not identify any other specific instances of "bizarre behavior" when he testified.
At the close of the hearing, DHS argued that the April 2 incident resulted in trauma to E that continued to affect her relationship with mother. Because mother had not yet engaged with counseling services, DHS argued, there "are still current risks that have not been mitigated." In response, mother argued that DHS had not met its burden of proving that "a current threat" created a risk of serious loss or injury to E. Mother emphasized that the April 2 incident had occurred more than two months before the hearing, that there had not been any recurrences, and that mother's treatment provider had testified that there was not any nonspeculative basis for thinking there would be a similar decompensation in the future. The juvenile court agreed with DHS, ruling that the agency had proved that mother's mental health problems impaired her ability to safely or competently parent E. Accordingly, it entered a judgment establishing dependency jurisdiction over the child.
On mother's appeal, the parties reiterate the arguments they made below. Those arguments implicate ORS 419B.100(1)(c), which provides that a juvenile court may assert dependency jurisdiction over a child whose "condition or circumstances are such as to endanger the welfare of the [child] or of others." That kind of endangerment exists when the child's condition or circumstances "create a current threat of serious loss or injury to the child" and there is "a reasonable likelihood that the threat will be realized."
*754 Dept. of Human Services v. S. P. , 249 Or. App. 76, 84, 275 P.3d 979 (2012) (internal quotation marks and citations omitted). In determining whether such a threat exists, a court's focus must always be on the child's current condition and circumstances, not on some point in the past. Dept. of Human Services v. S. A. B. O. , 291 Or. App. 88, 99, 417 P.3d 555 (2018).
Here, we agree with mother that DHS did not prove that mother's mental health challenges presented a threat of serious loss or injury to E-one that was reasonably likely to be realized-at the time of the dependency hearing. The juvenile court understandably was concerned about both the severity of the April 2 incident and the distress that E suffered as a result. However, the evidence in this record is insufficient to justify an exercise of dependency jurisdiction for two reasons.
First, nothing in the record supports a finding that it is reasonably likely that mother will suffer a comparable episode of decompensation in the future. Although mother has struggled to maintain her mental health for many years and lacks a complete understanding of her diagnoses and medications, nobody testified that she has had such an extreme paranoid episode in the past. Nor is there evidence that mother's lack of complete *96 insight into her own condition either led to the April 2 episode or is reasonably likely to lead to another similarly extreme incident. Moreover, although Rosanski testified that mother will decompensate if she does not take her medications, no evidence suggests that will occur; indeed, Rosanski agreed that nothing other than speculation would lead him to opine that mother will have another episode like the one she experienced on April 2. Although a pattern of behavior sometimes can serve as a basis for finding that similar conduct is reasonably likely to recur in the future, no such pattern has been established here. See Dept. of Human Services v. L. C. , 267 Or. App. 731, 744, 343 P.3d 645 (2014) (when the record does not include evidence of a pattern of relapse, jurisdiction "cannot be based on a parent's past conduct, absent individualized evidence that the parent's conduct is likely to recur and endanger the child"). *755 Second, nothing in this record supports a finding that mother's mental-health challenges put E at risk of serious loss or harm. True, mother's own testimony establishes that the events of April 2 scared E and made her very upset. That a parent's conduct frightens a child is not sufficient, however, to establish that the child has suffered-or is at risk of suffering-such significant psychological harm that juvenile court jurisdiction is justified. State ex rel. Dept. of Human Services v. D. T. C. , 231 Or. App. 544, 554, 219 P.3d 610 (2009) (evidence that father's conduct frightened his children and made him "mean and 'controlling' " did not establish harm to the children sufficient to "justify state intervention into the parent-child relationship"). The record includes no evidence that E has suffered significant or persistent psychological harm from the April 2 episode or would be at risk of such harm even if a similar episode occurred in the future.
Nor is a risk of serious harm established by mother's acknowledgement that she needs counseling to have a healthy parent-child relationship with E. Mother's testimony on that topic began with her responding affirmatively when the DHS lawyer asked whether the April 2 incident had affected her relationship with E; mother said it had, because E had been scared and tired. Mother went on to observe that she and E did not get to spend much time together at the time of the dependency hearing, which made it "a little difficult" on their relationship with respect to "growing and bonding." Following that testimony, the DHS lawyer asked mother whether she planned to meet with E's counselor, and mother said that she did; specifically, mother planned to meet with the counselor individually to prepare for herself and E to have counseling together. The DHS lawyer then asked mother if she believed that the counseling was something she and E needed to have their relationship "move forward in a healthy parenting, parent-child relationship." Mother answered, "Yes."
That brief testimony regarding the need for counseling does not justify an exercise of dependency jurisdiction. In context, it cannot reasonably be understood to signify more than an acknowledgement that family counseling *756 will be beneficial.[2] More to the point, mother's testimony is not sufficient to establish that, in the absence of such counseling, E presently is in circumstances that threaten her with serious loss or injury that is reasonably likely to be realized. Put differently, mother's acknowledgement that she and E need counseling to move forward with a healthy relationship does not establish that the current state of their relationship somehow endangers E. In the absence of evidence that mother's relationship with E is compromised in a way that puts E at risk, mother's acknowledgement that counseling is needed is not a sufficient basis for an exercise of dependency jurisdiction. Cf. Dept. of Human Services v. S. D. I. , 259 Or. App. 116, 123, 312 P.3d 608 (2013) (DHS failed to establish that transfer of child to mother's custody would create a risk of serious loss or injury because *97 it "provided no evidence that the harm to [the child] would be any greater than the customary distress that a child experiences when she is uprooted from her community and must form social bonds in a new place"). No such evidence is in the record here.
Reversed.

Father ultimately was convicted of third-degree sexual abuse and admitted to a jurisdictional allegation based on that conviction. He has not appealed and the jurisdictional allegation to which he admitted is not at issue here.

We observe that, had mother denied that family counseling would be helpful, that could have been considered evidence that she did not understand the dynamics of her relationship with E. Cf., e.g. , Dept. of Human Services v. L. F. , 256 Or. App. 114, 122, 299 P.3d 599, rev. den. , 353 Or. 787, 304 P.3d 466 (2013) (affirming jurisdictional judgment where the child had conditions that required therapy and the mother was unable or unwilling to attend the therapy sessions, which prevented her from understanding the childs' needs).