Argued and submitted January 17, reversed March 25, 2020

In the Matter of J. P. G.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. N.,
*Appellant.*

Umatilla County Circuit Court
17JU09366; A172039

462 P3d 771

In this juvenile dependency case, mother stipulated to two bases for juvenile court jurisdiction: (1) that her mental health problems interfere with her ability to safely parent and (2) that she does not understand the basic needs of child and she lacks necessary parenting skills. Mother later moved to dismiss dependency jurisdiction over child, and she appeals from the juvenile court's decision to deny that motion. She contends that the court erred in continuing jurisdiction, maintaining that the Department of Human Services (DHS) did not prove that the two original bases for jurisdiction still exist and pose a continuing risk of serious loss or injury to her child that will likely be realized should the court terminate jurisdiction. *Held*: The juvenile court erred in denying mother's motion to dismiss dependency jurisdiction. Although DHS presented sufficient evidence to establish mother's mental health conditions, her lack of parenting skills, and her lack of understanding of child's basic needs, DHS failed to present sufficient evidence that those issues present a current threat of serious loss or injury to child that is reasonably likely to be realized.

Reversed.

Eva J. Temple, Judge.

Elena Stross, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Beth Andrews, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

SHORR, J.

Reversed.

**SHORR, J.**

Mother appeals from the juvenile court's decision to deny her motion to dismiss dependency jurisdiction over her child. She contends that the court erred in continuing jurisdiction, maintaining that the Department of Human Services (DHS) did not prove that the two original bases for jurisdiction still exist and pose a continuing risk of serious loss or injury to her child that will likely be realized should the court terminate jurisdiction. We conclude that the juvenile court erred in concluding that DHS met its burden to prove that child was subject to a current threat of a "serious loss or injury" that is reasonably likely to be realized in the absence of dependency jurisdiction. As a result, we reverse the juvenile court's decision to deny mother's motion to dismiss dependency jurisdiction.

## FACTUAL BACKGROUND

This case concerns mother's child, J, who was born in 2014. In November 2017, mother stipulated to two bases for juvenile court dependency jurisdiction over J:

"[(1)(c)]   The mother does not understand basic needs of her child and lacks parenting skills necessary to safely parent child.

"* * * * *

"[(1)(e)]   The mother's mental health problems interfere with her ability to safely parent the child."

In January 2019, mother moved to dismiss jurisdiction, contending that those bases for jurisdiction "have ceased to exist and do not continue to pose a current threat of serious loss or injury, and there is little to no likelihood that any threat will be realized." The juvenile court held a hearing over the course of two days in July 2019 and ultimately denied the motion to dismiss jurisdiction. Although we have discretion to conduct *de novo* review, no party requests such a review, and we decline to exercise our discretion to do so because this is not an exceptional case justifying *de novo* review. ORS 19.415(3)(b) (providing that, upon appeal in an equitable action not involving a judgment terminating parental rights, the court "may" try the cause anew upon the record); ORAP 5.40(8)(c) (stating that the court will only

exercise discretion to try the cause anew in exceptional cases). Therefore, we view the evidence at the hearing and in support of that ruling "in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. A. R. S.*, 258 Or App 624, 627, 310 P3d 1186 (2013), *rev dismissed*, 355 Or 668 (2014).

In May 2017, mother lived in Bend, Oregon, with her two children.[1] She visited Dr. Scott Safford, a psychologist, because she was experiencing hallucinations. According to Safford, she presented with depression, anxiety, and "a range of what's called 'psychotic symptoms.'" Mother had several types of hallucinations, including tactile, gustatory, and olfactory hallucinations. Mother reported feeling things crawling on and biting her skin, seeing bugs in her peripheral vision, hearing voices, tasting food as rotten, and smelling mold on herself and her clothes. Safford diagnosed her with depression, anxiety, insomnia, and a "psychotic disorder."

In July 2017, mother left J in the care of mother's aunt and uncle in Pendleton while she went to the beach with a friend and her other child.[2] At some point during or after that trip, DHS received a report of abuse or neglect regarding one of the two children, which ultimately resulted in a founded allegation by DHS of neglect against mother. DHS initially placed both of the children in the care of the aunt and uncle. Later, in August 2017, DHS placed the children with the aunt and uncle as "safety service providers." As part of a cooperative plan with mother, mother and the children moved into a basement living unit that was part of a rental property that the aunt and uncle owned in Pendleton.

On one occasion in October 2017, J interrupted mother while she was smoking outside their unit. Mother relayed to her aunt that, at that time, she "had this urge to hit [J] with [a] barbecue lighter and that it was bothering her. She didn't know why she wanted to hit her so bad with it." Mother's aunt reported that mother would get

---

[1] This case concerns only one of those children.

[2] The aunt and uncle were intervenors in the juvenile court proceeding.

upset when J was ignoring mother or went to the aunt for attention. Mother would "just shut down" and say, "I'm out of here. You can F-ing have her," and leave. Mother would tell J that she wished J "was never born. Her life would be easier if she had never been born." DHS filed its dependency jurisdiction petition shortly after the October 2017 incident.

Mother decided not to contest the petition and, instead, admitted to the two jurisdictional allegations noted above. The juvenile court then required mother to comply with DHS recommendations, including psychological evaluation and treatment. Mother participated in some services, but quit her mental health counseling and would not sign a release of records to DHS for all of her services.

Mother did participate in a mental health evaluation with Dr. Deitch in September 2018. Mother categorically denied all of DHS's concerns regarding her parenting and all of the allegations against her. Deitch found that mother "frequently did not answer questions directly and came across as deceptive and manipulative at times, with questionable credibility." He testified that mother demonstrated a "lack of insight" and "saw little need for changes in her behavior," placing her at a below average level of "treatment motivation." Ultimately, Deitch did not find "current evidence * * * of depression, anxiety, [or] PTSD." Deitch also could not find "evidence [of] symptoms of a thought disorder or any psychotic symptomology."[3] Deitch did not "glean from the interview that [mother] was experiencing psychotic symptoms, nor did it come up in the testing results, per se." Deitch agreed that it would have been hard for mother to cover up such conditions. Deitch remarked that he could not diagnose a psychotic disorder based on a report of isolated incidents of hallucination.

Deitch diagnosed mother with "dependent and antisocial personality features" and informed the court that he found those features present in mother and concerning. Deitch's diagnosis of dependent features was based, in part,

---

[3] Deitch noted that there was at least a reported history of schizophrenia and other reported historical mental health issues, but that it was difficult to get a clear history of mother's mental health symptoms due to her pattern of evasiveness and withholding.

on mother's past relationships with the two fathers of her two children, both of which relationships involved domestic violence, and on the results of his interview with mother and diagnostic assessments. Although he did not quantify the risk, Deitch testified that mother "may" put the needs of another relationship or person over her needs or the needs of her children.

Deitch testified that the antisocial personality features "are associated with criminal tendencies," "a pattern of not fulfilling her obligations, endangering the lives of other people, and that could be her children," and "[n]ot following through with expectations and obligations." Deitch could not diagnose an antisocial personality disorder because he did not find that mother's antisocial personality traits dated back to adolescence.

Deitch concluded that he had concerns about (1) mother's lack of insight into her conduct and conditions that led to her children being placed in foster care, (2) mother's ability to "consistently adjust her conduct in a way for the children to be returned to her care," and (3) "her prognosis for being a consistently safe, stable and protective long-term residential parenting resource," which he considered "guarded." He noted that "[p]ositive prognostic signs will be those of her consistently following a safety plan, engaging in services in a more transparent fashion, and demonstrating greater insight and judgment with regard to the reasons why her children were placed into protective custody in the first place." He concluded that mother's motivation for treatment was "below average" and that she saw "little need for changes in her behavior." He also concluded that the concerns that he had had following his initial evaluation with mother were still being manifested at the time of the hearing on mother's motion to dismiss jurisdiction.

Deitch also testified that, although he had not met J, based on his prior assessment of mother, he had a "concern" of continuing neglect by mother and her "not tracking" what the children were doing, and "not following through with meeting their needs." Despite those concerns, Deitch did not believe that mother's failure to follow through with her mental health issues were an indication that she was

dangerous to her children. Although Deitch had concerns about mother's lack of follow through, impulsivity, and codependency issues, he found "nothing that would indicate physical abuse or danger to [J] along those lines."

With respect to mother's ability to "understand [the] basic needs of her child" and have "parenting skills necessary to safely parent child," DHS presented the following evidence regarding that continuing basis for dependency jurisdiction. Mother at one point refused to engage in visits with J unless she was granted overnight visits. Deitch testified that mother's refusal to attend visits because she could not get what she wanted "ha[d] more to do with her needs and less with the children's needs" and that mother "did not seem to have an understanding of the impact of her behaviors" on her children.

A number of the supervised visits went poorly. At a March 2018 visit, mother could not control her emotions and ignored her children while she rocked in a chair and cried while J tried to console her. The caseworker believed that mother would have ignored the children for hours had the caseworker not intervened. At a supervised visit where J had an accident and soiled her underpants, mother had J take them off in the bathroom, but then refused the caseworker's offer of substitute children's underwear or clothing. The visit ended early and J left crying, believing that she was in trouble, and not understanding why she could not have underwear.

In March 2018, mother resided in a furnished apartment that she kept for her and the children. Mother had multiple visits with J at the apartment. When J arrived for one in-home visit, the apartment was empty because mother had given away all of the furnishings, including the children's beds and other belongings. Mother stated that the furnishings had a "bad aura" and that she needed a "cleanse" to remove "negative energy." Mother gave the children no explanation for why she had given away the furniture. The children were emotional, confused, and "upset that there was nothing left." Deitch testified that such a situation could be "scary and confusing," particularly if there was no explanation. Mother's case manager at "CAPECO,"

who was helping mother with housing, reported that mother had told her that she had suffered from anxiety and that something had told her to get rid of all of her belongings. Mother acknowledged that some of her behavior when giving away J's belongings and ending visits had been emotionally harmful to J.

At some point around late 2018 or early 2019, mother moved to Las Vegas to live with her mother, the grandmother of J. In spring 2019, mother left Las Vegas, stopped for some period in Bend, and then moved back to Pendleton on the advice of her attorney in a related case. Mother was living in her car in Pendleton. Deitch was concerned that mother had not been "moving herself in a direction that would allow her to have the kids in her care." Mother testified that she would not have a child live in a car with her but would go live with her child at grandmother's home in Bend.

In June 2019, mother asked CAPECO to help her with housing in Pendleton. Her CAPECO case manager advised mother that she needed to work with DHS, engage in mental health treatment, and find gainful employment to meet the expectation for CAPECO's housing program. Mother was still living in her car at the time of the hearing.

At a visit in July 2019, shortly before the hearing, mother took offense to J stating that mother had lied and proceeded to tell J, "[t]his may be the last time you see me." Mother stepped out and, despite counseling from the caseworkers to finish her visit with J, walked away from the visit. Mother later testified that the interaction would be "[c]onfusing in a sense" to J, but "at the same sense, [J] is very smart. *** But, as a child, I see that could impact her, you know, multiple ways."

With respect to mother's parenting skills, mother had completed four different parenting classes. Deitch noted that, with respect to direct questions regarding parenting, mother's answers "were rather self-promoting and, consistent with her verbalizations during the interview, she did not always answer the questions directly." Nevertheless, Deitch also concluded that mother's responses "did not reflect negative or dysfunctional parenting attitudes or practices" and that "she provided a number of thoughtful and sound

parenting principles as well." Deitch did not think that mother would need "basic parenting classes."

## THE JUVENILE COURT'S RULING

After mother moved to dismiss, the juvenile court held a two-day hearing during which the evidence above was presented. Following the presentation of evidence and argument, the court denied the motion to dismiss:

> "The two questions that the Court needs to answer *** are do the original bases for jurisdiction still exist and, if they do, how likely is it that they will result in harm to the child's welfare?
>
> "The two original jurisdictional bases were that mother does not understand basic needs of her child and lacks parenting skills necessary to safely parent the child; and two, that mother's mental health problems interfere with her ability to safely parent the child. I am finding that those bases do continue to exist, and they're somewhat intertwined. I think mental health problems always seem to intertwine with not understanding the basic needs of a child because, when someone is struggling with a mental illness, [they are] not necessarily understanding the reality of themselves or others."

The court then recounted evidence supporting its conclusions, including some of what is recounted above.

Ultimately, the court concluded:

> "So I am not going to grant this motion to dismiss. I do find that the bases for jurisdiction are still very much present, and I think it is very likely that they will result in harm to [J] if I were to dismiss the case and place her with her mom right now.
>
> "*****
>
> "*** That doesn't mean the case goes away. That doesn't mean it all ends for [mother]. It means you need to decide if you're going to work on mental health issues and if you're going to work on stability. Living with [grandmother] in Bend—that may be a really good plan.
>
> "If that is the real plan, that's the plan you need to follow. *** You need to have DHS in Bend work with [grandmother].

"* * * * *

"So, for now, I am denying the motion to dismiss."

In three related assignments of error, mother assigns error to that decision and to the two component conclusions by the juvenile court that the original stipulated bases for jurisdiction persisted and presented a serious risk of harm to J should dependency jurisdiction be dismissed. We address mother's assignment of error to the denial of her motion to dismiss dependency jurisdiction and, in addressing that assignment, discuss the separate conclusions that led to the court's ruling.

### ANALYSIS

ORS 419B.100(1)(c) grants a juvenile court dependency jurisdiction over a child "[w]hose condition or circumstances are such as to endanger the welfare of the [child] or of others." When a parent moves to dismiss dependency jurisdiction, the juvenile court must undertake a two-part inquiry. *Dept. of Human Services v. T. L.*, 279 Or App 673, 684, 379 P3d 741 (2016). First, "[t]he court must determine whether the original bases for jurisdiction continue to pose a current threat of serious loss or injury" to the child. *Id.* at 685. If they do, the court must next "assess the likelihood that that risk will be realized." *Id.* To continue jurisdiction, there must be a "reasonable likelihood of harm to the child's welfare in the absence of dependency jurisdiction." *Id.* Both prongs of the test must be satisfied.

Although it may be the parent's motion, the burden is on DHS to prove by a preponderance of the evidence "that the factual bases for jurisdiction persisted to a degree that they posed a current threat of serious loss or injury that is reasonably likely to be realized." *A. R. S.*, 258 Or App at 635. In deciding whether to continue jurisdiction, "the court must consider all of the facts in the case before it and * * * consider whether, under the totality of the circumstances, the child's welfare is endangered." *Dept. of Human Services v. J. M.*, 275 Or App 429, 441, 364 P3d 705 (2015), *rev den*, 358 Or 833 (2016) (internal quotation marks omitted).

As we note above, we view the evidence in the light most favorable to the juvenile court's disposition and "assess

whether, when so viewed, the record was legally sufficient" to support the court's decision. *A. R. S.*, 258 Or App at 627. The juvenile court concluded that both of the original bases for dependency jurisdiction continued to persist and posed a current serious risk of harm to J should jurisdiction be dismissed. We examine each original jurisdictional basis in turn.

We start with the jurisdictional basis relating to mother's mental health. Mother stipulated to jurisdiction on the basis that her "mental health problems interfere with her ability to safely parent the child." In the months before jurisdiction was taken over J, mother had been diagnosed with depression, anxiety, insomnia, and a psychotic disorder. She had been reporting hallucinations. One difficulty in this case is that the subsequent psychologist, Deitch, whom mother was referred to by DHS, testified that he "wasn't finding current evidence *** of depression, anxiety, [or] PTSD." Deitch also could not find "symptoms of a thought disorder or any psychotic symptomology." Rather, Deitch concluded that his concerns arose from his diagnosis of "dependent and antisocial personality features."[4]

We assume for the purpose of this opinion that a parent may have mental health issues later during the period of a dependency jurisdiction that are different or better diagnosed than the mental health issues that were apparent at the beginning of jurisdiction but continue to present a current threat to a child's safety. Regardless, we conclude that the juvenile court erred when it determined that DHS met its burden to show that the mental health issues present at the time mother moved to dismiss jurisdiction posed "a current threat of serious loss or injury that is reasonably likely to be realized." *A. R. S.*, 258 Or App at 635. With respect to those mental health issues that were present right before the court took jurisdiction—namely depression, anxiety, insomnia, and a "psychotic disorder"—DHS's mental health expert, Deitch, did not find any current evidence of those issues at the time of his evaluation. As a result, DHS did not

---

[4] We do not assume that a specific diagnosis is necessary for a court to find that a parent has a mental health issue. However, here, Deitch testified that his concerns for J arose out of his diagnoses of "dependent and antisocial personality features."

meet its burden before the juvenile court to prove the first prong of the test, that those aspects of "the original bases for jurisdiction continue" and, if they did not continue, they could not "pose a current threat of serious loss or injury" to J. *T. L.*, 279 Or App at 685.

With respect to the mental health conditions that Deitch found present before the motion to dismiss and continuing to the hearing, Deitch concluded that mother had "dependent and antisocial personality features." We conclude that the juvenile court erred in concluding that DHS met its burden to show that those features, which we agree that DHS established were present, posed a current threat of serious loss or injury to J that is reasonably likely to be realized. As to the dependent features, Deitch noted that there had been domestic violence issues in her relationships with both of the fathers of her two children. He believed there was a continuing risk that mother's codependency issues and trouble establishing herself independently created a risk where she "may" put the needs of the relationship or another person over her own needs or the needs of her children. He did not further quantify how likely that risk was. The juvenile court, in its findings, also noted mother's history of a past abusive relationship with the father of her other child around when mother gave birth to that child, which was nearly three years before the hearing. However, the evidence before the court was that mother had abstained from such relationships since that time, which Deitch indicated was a good sign. There was no other evidence presented of current or recent abusive relationships, and Deitch testified that there was no evidence mother was involved in serial relationships.[5]

We recognize the possibility that a parent with codependency features may continue to present a current threat of serious loss or injury to a child that is reasonably likely to

_____

[5] There was evidence that mother had stayed with a man named Martin who, around July 2017, had taken drugs and "thrash[ed]" his own home with a bat when mother was visiting him, causing mother to leave to go to a domestic violence shelter. No children were present, and the extent and nature of mother's relationship with Martin was not further established. Deitch testified that the incident could be evidence of a pattern of returning to an abusive relationship, but he would have to know more about the situation.

be realized even though the parent is not in a current abusive or dependent relationship. However, because there was no evidence mother had been in an abusive relationship for a few years, and Deitch did not further explain how likely it was that mother's dependent features posed a serious risk to J, we conclude that the juvenile court erred in concluding that DHS met its burden to show that mother's dependent features posed a current threat of serious loss or injury to J.

"Because juvenile court jurisdiction over a child must be based on a current and non-speculative threat, it cannot be based on a parent's past problems, absent evidence that the problems persist *and endanger the child.*" *Dept. of Human Services v. L. C.*, 267 Or App 731, 742, 343 P3d 645 (2014) (emphasis added). Although DHS points to Deitch's diagnosis of dependent personality features that *could* cause mother to put the needs of a partner or other person above her children, DHS does not otherwise argue before us that mother's codependency issues manifested "a current threat of serious loss or injury that is reasonably likely to be realized" due to mother prioritizing a partner or another person's needs over those of J. *A. R. S.*, 258 Or App at 635.

As to Deitch's diagnosis of antisocial personality features, Deitch testified that those were associated with criminal tendencies and noted mother's prior misdemeanor several years earlier relating to biting the father of her other child and, at some point after that incident, violating a no-contact order with the same person. Deitch also testified that the features "have to do with a pattern of irresponsibility, a pattern of not fulfilling [mother's] obligations, endangering the lives of other people, and that could be her children."

The only evidence of alleged criminal conduct as to mother related to the same two incidents described by Deitch above. There was no further evidence that mother's past conduct posed a current threat of serious loss or injury to J. Similarly, Deitch's general testimony that the antisocial personality features "have to do with" a pattern of irresponsibility, not fulfilling obligations, and endangering

others' lives "that could be her children," even when appropriately considered in the totality of the circumstances, does not demonstrate the nexus between mother's mental health and a serious risk of loss or harm to J that is likely to be realized absent juvenile court jurisdiction. *See Dept. of Human Services v. C. J. T.*, 258 Or App 57, 62, 308 P3d 307 (2013) (stating that "DHS has the burden to demonstrate a nexus between the allegedly risk-causing conduct and the harm to the child").

We turn to the other stipulated basis for jurisdiction, that mother "does not understand basic needs of her child and lacks parenting skills necessary to safely parent child." Again, the legal issue is whether DHS met its burden to show that "the original bases for jurisdiction continue to pose a current threat of serious loss or injury." *T. L.*, 279 Or App at 685. And DHS had to prove that there is a reasonable likelihood of harm to J in the absence of dependency jurisdiction. *Id.* We consider "whether, under the totality of the circumstances, the child's welfare is endangered." *J. M.*, 275 Or App at 441.

We conclude that DHS did not meet its burden on the second basis for jurisdiction to show that J was facing a current threat of a *serious* loss or injury that is reasonably likely to be realized should dependency jurisdiction be terminated. *A. R. S.*, 258 Or App at 635. We note first that, although there was evidence that, before the court took jurisdiction, mother had an urge to hit J, she did not act on that urge, and there is no evidence in this record that mother ever physically abused J. Deitch testified at the hearing that he was not concerned about a risk of "physical abuse or danger to [J] along those lines." DHS does not appear to argue before us that this is a case involving a serious risk of physical abuse or physical danger.

The issue before us is whether there is a current threat of serious emotional harm due to mother's lack of understanding of her child's basic needs or her poor parenting skills. We conclude that, although DHS presented sufficient evidence that mother lacks an understanding of her child's basic needs and that mother has poor parenting skills, DHS failed to present sufficient evidence that child's

conditions or circumstances present a "current threat of serious loss or injury that is reasonably likely to be realized." *Id*. DHS presented evidence that mother's conduct with J was, on several occasions, bizarre, manipulative, and withdrawn, and that it caused J to be "scar[ed]," "upset," "confus[ed]," and "emotional." However, that a parent's conduct has, during several occasions, caused a child to be very upset, scared, or frightened does not, without more, establish "such significant psychological harm that juvenile court jurisdiction is justified." *Dept. of Human Services v. C. L. R.*, 295 Or App 749, 755, 436 P3d 92 (2019).

As we have stated in the past, jurisdiction is not appropriate merely because there is a risk of some harm, but "the type, degree, and duration of the harm must be such that exposure to a reasonable likelihood of that harm justifies juvenile court jurisdiction." *Dept. of Human Services v. S. D. I.*, 259 Or App 116, 121, 312 P3d 608 (2013). As in *S. D. I.*, DHS did not present evidence of the type, degree, and duration of emotional harm likely to be suffered by J should jurisdiction terminate. As stated in that case, "[a]lthough we can imagine that an expert might be able to testify to that effect, the state did not present any such testimony." *Id*. at 123 (internal quotation marks omitted); *see also C. L. R.*, 295 Or App at 755 (stating that the record contained no evidence that the child "suffered significant or persistent psychological harm" from mother's single psychotic episode or "would be at risk of such harm even if a similar episode occurred in the future").

We acknowledge the possibility that such evidence can be presented without an expert, and there is certainly some evidence of a risk of emotional harm to J here, but there is not a record that would allow us to conclude without speculation that the current threat of emotional harm is so serious in its type, degree, and duration as to require continued juvenile court jurisdiction.[6]

---

[6] Mother alternatively argues that, should we "conclude that mother [is] incorrect with regard to both the nexus and the degree of harm posed by mother's conditions," reversal is nonetheless warranted because "any harm posed by mother's conditions [is] sufficiently mitigated" by mother's plan for her and J to live with grandmother. However, our resolution of mother's primary argument obviates the need to address mother's alternative argument.

In sum, we conclude that, even when properly viewing the evidence in the light most favorable to the juvenile court's decision, the court erred when it denied mother's motion to dismiss dependency jurisdiction.

Reversed.